736 A.2d 1261

IN THE MATTER OF THE GUARDIANSHIP OF
DMH, CLHW, LFH AND RQH, MINORS.

Argued November 9, 1998—Decided August 3, 1999.

*Andrea M. Silkowitz,* Assistant Attorney General, argued the cause for appellant, New Jersey Division of Youth and Family Services (*Peter Verniero,* Attorney General of New Jersey, attorney; *Jaynee LaVecchia,* Former Assistant Attorney General, of counsel).

*Nancy Goldhill,* argued the cause for respondent, L.R. (*Melville D. Miller, Jr.,* President, Legal Services of New Jersey, attorney, *Ms. Goldhill* and *Beatrix W. Shear,* on the briefs).

*Mary Patricia Keefe,* Law Guardian, submitted a notice of appearance on behalf of the minor children CLHW, LFH and RQH.

The opinion of the Court was delivered by

HANDLER, J.

This appeal, a companion case to *In re Guardianship of K.H.O.,* 161 *N.J.* 337, 736 *A.*2d 1246 (1999), requires the Court to consider whether the Division of Youth and Family Services has established by clear and convincing evidence that the termination of parental rights is in the best interests of two children under the statutory standards of *N.J.S.A.* 30:4C–15.1(a). In addressing that ground for decision, the Court must consider the relation of that standard to an alternative statutory standard based on parental abandonment. *N.J.S.A.* 30:4C–15(d).

The issues that must be addressed in this appeal are whether the Division has demonstrated by clear and convincing evidence that the two children were harmed by their parents and whether the Division engaged in diligent efforts to unite this biological parent with his children.

I

L.R. is the biological father of the two children, C.H. and R.H. The biological mother of the children, K.H., now deceased, also had two other children, D.M.H. and L.H., who were not fathered by L.R.[1] In this appeal, we have been asked to consider only L.R.'s parental rights as the biological father of C.H. and R.H.

D.M.H., K.H.'s oldest child, was born April 26, 1986 and currently resides in a group foster home. C.H. was born July 19, 1990 and currently resides in a foster home with her half-brother, L.H., who was born September 10, 1991; she has been in foster care since she was three-and-a-half years old. R.H., the youngest, was born on June 17, 1993 and resides in a different foster home; he has been in foster care since he was five days old.

The Division of Youth and Family Services (DYFS) became involved with the family in September 1991, when L.H. was born testing positive for cocaine and opiates, as did his mother. K.H.'s mother agreed to care for the three children, and L.H. was released into his grandmother's care. K.H. was referred to a substance abuse program.

In June 1993, K.H. gave birth to R.H. Both mother and child tested positive for heroin, and R.H. was placed in foster care voluntarily. Throughout, K.H. and her three other children were living in overcrowded conditions with the grandmother. K.H. and three of her children were transferred to a shelter. Shortly thereafter, K.H. signed voluntary agreements with DYFS for the

---

[1] The parental rights of J.M., the father of D.M.H., were not terminated in the proceedings below. The parental rights of L.W., L.H.'s father, were terminated, but he does not appeal the termination.

foster care placement of her children, who had been left dirty and unsupervised in the shelter.

In November 1993, DYFS caseworkers learned for the first time that L.R. was the biological father of C.H. and R.H. L.R. expressed a desire to unite with his children eventually, but did not offer to become their caretaker. DYFS caseworkers continued efforts to reunite the children with K.H. as the likely primary custodial parent, in the absence of any steps on the part of L.R. towards assuming custody or participating in their care.

In February 1994, L.R. informed a DYFS caseworker that K.H. had physically assaulted him and that as a result he had admitted himself for psychiatric treatment. In April 1994, L.R. was again voluntarily hospitalized; he was admitted for depression and heroin detoxification and diagnosed with schizo-affective disorder, organic mood disorder, and opioid dependence.

Six months later, in October 1994, L.R. informed DYFS that he wanted the children placed with him, but, despite several reminders, he never returned the police reports necessary to initiate the placement procedure.

In March 1995, in a chance encounter with a DYFS caseworker, L.R., who had not seen his children for a long time, expressed a desire for resumed visitation but failed to follow through. In July 1995, the case was transferred to the Adoption Resource Center, L.R. having taken no steps towards assuming responsibility for his children. L.R. was notified and expressed no opposition to the adoption of the children; he inquired only about continued visits.

Thereafter, in August 1995, L.R. moved to Virginia. K.H. died two months later, in October 1995. One month after that, following his return to New Jersey, L.R. was voluntarily hospitalized, again for heroin detoxification. From November 1995 to May 1996, L.R. had no contact with the children.

DYFS moved to terminate L.R.'s parental rights in March 1996. The court ordered a psychological evaluation of L.R. and bonding

evaluations for the children. The termination hearing was held on October 15 and 16, 1996.

According to the court-appointed expert, Dr. Karen Wells, L.R. loves his children and has a bond with them; nevertheless, he is unable to care for them. Dr. Wells reached the further conclusion that C.H. and her half-brother L.H. were bonded with their foster parents, whom they regarded as psychological parents. As for R.H., Dr. Wells determined that he was a child with special needs; she did not, however, provide a full psychological or bonding evaluation of R.H. At that time, R.H.'s foster parents had not expressed an interest in adopting him. Since then, R.H.'s foster mother has declared her desire to adopt the child.

The trial court ordered the termination of L.R.'s parental rights, expressing its findings in terms of the abandonment standard, as set forth in *N.J.S.A.* 30:4C–15(d). The court found that L.R. had failed to make any substantial effort to plan for the future of his children from the time he first acknowledged paternity in 1993, although able to do so. Additionally, the court found that further delay in the permanency plan would harm the children. Although the court expressed the view that L.R. had not harmed the children, the final order of termination specified that DYFS had met all the requirements for termination under the best interests of the child standard, which includes harm to the child from the parental relationship. *N.J.S.A.* 30:4C–15.1(a).

The Appellate Division reversed, finding that the evidence was insufficient to support termination of parental rights based on an abandonment standard. The Appellate Division also determined that DYFS had not met the four-prong best interests of the child standard, failing to show that L.R. caused harm to the children and that DYFS had engaged in diligent efforts to unite the children with their biological father. 309 *N.J.Super.* 179, 706 *A.*2d 1129 (1998). The Court granted the DYFS's petition for certification. 156 *N.J.* 409, 719 *A.*2d 641 (1998).

Following the decision of the Appellate Division, DYFS filed a Title 9 abuse/neglect complaint against L.R. Psychological evalua-

tions of L.R., the children, and their foster parents were conducted at the request of DYFS by Dr. Alice Nadelman in October 1998, and the results set forth in a report dated December 10, 1998.[2] Dr. Nadelman found that L.R. has "no capacity to provide care or protection for children" and that he "has been unable to maintain even minimal responsibilities or contact with his children." She determined that the children, C.H. and R.H., have "endured emotional turmoil and damage" and that continued impermanence would be detrimental to them. She explained that C.H. and L.H. had bonded with their foster parents and that the foster parents could offer them the stable, permanent home they need. She also found that R.H. had bonded with his foster mother, who is willing to adopt him. Accordingly, she "strongly recommended" termination of L.R.'s parental rights.

## II

DYFS brought this action to terminate the parental rights of L.R. under *N.J.S.A.* 30:4C–15.1(a). That statute is referred to as the best interests of the child standard; it prescribes an integrated multi-element test that must be applied to determine whether termination of parental rights is in the best interests of the child. *See K.H.O., supra,* 161 *N.J.* at 337, 736 *A.2d* 1246. This standard was first adopted by the Court in *New Jersey Division of Youth & Family Services v. A.W.,* 103 *N.J.* 591, 512 *A.2d* 438 (1986), and later codified in *N.J.S.A.* 30:4C–15.1(a).

Under the statute, parental rights may be terminated upon a showing of each of the following four factors by clear and convincing evidence:

---

[2] That report, which has been available to all parties, was furnished to the Court at its request. No evaluations have been undertaken on behalf of L.R. Although the report has been examined by the Court in conjunction with its consideration and disposition of this appeal, the report was not formally introduced as evidence, and is, therefore, not relied on as evidence of record in determining the issues on this appeal. The report, however, is relevant in respect of the necessity for a remand and what issues, if any, remain to be determined.

(1) The child's health and development have been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his foster parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made diligent efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[*N.J.S.A.* 30:4C–15.1(a) (1998).][3]

The alternative statutory standard, *N.J.S.A.* 30:4C–15(d), considered by the trial and appellate courts in disposing of this case, provides that termination of parental rights is permitted where:

it appears that a parent ... following the placement or commitment of such child in the care of an authorized agency, whether in an institution or in a foster home, and notwithstanding the diligent efforts of such agency to encourage and strengthen the parental relationship, has failed for a period of one year to remove the circumstances or conditions that led to the removal or placement of the child, although physically and financially able to do so, notwithstanding the division's diligent efforts to assist the parent or guardian in remedying the conditions[ ... ][4]

This provision has been characterized as an abandonment standard, requiring a finding that "a parent has willfully forsaken obligations, although physically and financially able to discharge those obligations." *In re Adoption of Children by L.A.S.*, 134 *N.J.* 127, 134–35, 631 *A.*2d 928 (1993). Under this standard, abandonment can be established if the parent has "engaged in a course of conduct that 'evidences a settled purpose to forgo all parental duties and relinquish all parental claims to the child.'" *Id.* at 135, 631 *A.*2d 928 (citation omitted). As this Court explained in *In re Guardianship of J.C.*, "[t]he concept of abandonment entails volitional and purposeful conduct that equates with a willful giving up

---

[3] *N.J.S.A.* 30:4C–15.1(a) was amended in 1999. *L.* 1999, *c.* 53, § 30. Those changes do not affect the disposition of this appeal.

[4] *N.J.S.A.* 30:4C–15(d) was amended in 1999. The term "diligent efforts" was changed to "reasonable efforts" in the amended statute. *L.* 1999, *c.* 53, § 29.

of parental rights and duties." 129 *N.J.* 1, 17, 608 *A.*2d 1312 (1992). Thus, abandonment may not be based on parental conduct that is only uncertain, ambivalent or equivocal in fulfilling parental duties. *See In re Adoption of a Child by D.M.H.*, 135 *N.J.* 473, 488, 641 *A.*2d 235 (1994) (*D.M.H.* (I)) (observing that abandonment cannot be based on conduct that includes "the purposeful resumption of parental obligations.").

In *L.A.S.*, *supra*, 134 *N.J.* at 134, 631 *A.*2d 928, the Court pointed out the overlap between the abandonment standard and the best interests of the child standard. Both standards for termination share, as a fundamental and common ground for the termination of parental rights, the establishment of parental unfitness that results from the parent's failure to care for and protect the child. *Ibid.* The Court differentiated the two standards on the basis that abandonment requires a showing of volitional conduct in failing to care for and protect the child that amounts to a repudiation or forsaking of parental obligations. *Id.* at 135, 631 *A.*2d 928. The best interests of the child standard requires a showing of very substantial and continuing or recurrent abuse or neglect that endangers the child's health and development. *Ibid.*; *see also J.C.*, *supra*, 129 *N.J.* at 10, 608 *A.*2d 1312; *In re Guardianship of K.L.F.*, 129 *N.J.* 32, 45, 608 *A.*2d 1327 (1992); *A.W.*, *supra*, 103 *N.J.* at 616, 512 *A.*2d 438.

In this case, DYFS determined that L.R.'s parental unfitness consisted of substantial and continuing neglect and that his failure to provide any care and support for his children resulted in harm that endangered their welfare. DYFS acknowledged, however, that L.R. did not "abandon" his children; he did not wilfully forsake them; he professed parental love for them and sporadically expressed interest in providing for them. Accordingly, DYFS sought to terminate L.R.'s parental rights not under the abandonment standard of *N.J.S.A.* 30:4C–15(d), but pursuant to the best interests of the child standard of *N.J.S.A.* 30:4C–15.1(a). The evidence and findings of fact in this case may be more readily applied to the parental unfitness grounds incorporated in the best

interests of the child standard than to the alternative abandonment standard. We determine, therefore, that the salient issues to be addressed are those raised under the statutory standard of *N.J.S.A.* 30:4C–15.1(a).

### III

Although findings made by the trial court referred to the abandonment standard of *N.J.S.A.* 30:4C–15(d), those findings and the underlying evidence are relevant to the criteria of the best interests inquiry. In fact, the trial court's order was entered under *N.J.S.A.* 30:4C–15.1(a). Although the trial court's legal analysis was confusing and its findings somewhat misdirected and incomplete, the underlying evidence and the court's findings of fact may be reviewed to ascertain whether the evidence fulfills the best interests standard of *N.J.S.A.* 30:4C–15.1(a). Further, the Appellate Division also reviewed the evidence under the best interests standard. The appellate court in effect applied that standard in concluding that the trial court's determination that L.R. had not harmed the children was "unassailable," and that there was not sufficient evidence that termination would not do more harm than good under that standard. In these circumstances, we may render complete findings based on the evidence of record in order to dispose of the important issues in this case. *Cf. R.* 2:10–5 (authorizing appellate court to exercise original jurisdiction and make findings in interests of justice).

### A.

The first two elements of the best interests of the child standard relate to the finding of harm arising out of the parental relationship. The statute provides, in part:

(1) The child's health and development have been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that

separating the child from his foster parents would cause serious and enduring emotional or psychological harm to the child[.]

[*N.J.S.A.* 30:4C–15.1(a) (1998).]

While the second prong more directly focuses on conduct that equates with parental unfitness, the two components of the harm requirement, *N.J.S.A.* 30:4C–15.1(a)(1) and (2) are related to one another, and evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child. *See K.H.O., supra,* 161 *N.J.* at 348–49, 351–52, 736 *A.*2d at 1251–52, 1253–54.

As this Court has stressed, the attention and concern of a caring family is "the most precious of all resources." *A.W., supra,* 103 *N.J.* at 613, 512 *A.*2d 438. Both of these children have been denied this precious resource by their biological parents for many years. A parent's withdrawal of that solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child. *K.H.O, supra,* 161 *N.J.* at 352–54, 736 *A.*2d at 1254–55. We do not refer here to a notion of "inadequate parenting," but rather to L.R.'s failure to provide even minimal parenting to his children. *See A.W., supra,* 103 *N.J.* at 606–07, 512 *A.*2d 438.

L.R. shares in the responsibility and blame for the plight of his children. While the infant C.H. was living with her mother, the child suffered from neglect and instability, resulting in damage that remains with her to this day. During this early period, L.R. was nearby, knew of the conditions under which his child was living, yet did not ameliorate them; he failed to acknowledge paternity until 1993. DYFS caseworkers visiting the house between 1991 and 1993 found the family to be living in an overcrowded apartment under "deplorable" conditions. When his children were at risk of being placed in foster care due to their mother's neglect, drug abuse, and homelessness, L.R. did not come forward to request that they be placed in his custody. Nor did L.R. assist in securing adequate housing or providing care for the children when they were still in the custody of K.H. Thus, he compounded the mother's neglect and contributed to the circumstances that

required the eventual placement of the children in foster care. The instability and lack of adequate care that characterized the lives of these children did not improve, but in fact deteriorated, after L.R. acknowledged his paternity. Following the biological mother's death, L.R. did not provide the children with the emotional support and comfort or even the reassurance of physical presence that such a trauma would require of a parent. Instead, he failed even to visit the children for six months.

Each child has suffered. L.R., no less than K.H., permitted C.H. to live unsupervised and unkempt in the shelter where DYFS had temporarily placed the family. DYFS eventually removed C.H. for lack of adequate supervision. C.H.'s special needs, a result of these experiences, are well documented in the record. These have been expressed in aggressive behavior, use of sexually explicit language beyond her years, and stealing. During the period after the initial hearing, C.H. required hospitalization due to angry and explosive actions at school. Dr. Wells, the initial expert, testified that C.H.'s problems are attributable in part to the unstable environment and inadequate living conditions she experienced during her first few years of life. We note that Dr. Nadelman, the second expert, confirmed this opinion, observing that C.H.'s emotional problems were the result of the "instability and turmoil" of her early life.

█ R.H. has been in foster care since shortly after his birth. L.R. did not protest R.H.'s placement in foster care, and did not express any parental interest until after the child had been voluntarily placed in foster care. Outside of occasional visits, L.R. has never provided R.H. with any paternal care, nurture, or support. R.H. was born with heroin in his system due to his mother's drug use during her pregnancy; that harm was compounded by L.R.'s persistent failure to perform any parenting functions and to provide nurture, care, and support for R.H. for over three years. This constitutes a parental harm to that child arising out of the parental relationship and cognizable under

*N.J.S.A.* 30:4C–15.1(a)(1) and (2). *K.H.O., supra,* 161 *N.J.* at 352–54, 736 *A.*2d at 1254–55.

The record further supports the conclusion of parental unfitness. It reveals that L.R. will likely never be able to provide his children with an adequately stable home. Dr. Wells concluded that L.R. was unable to perform the day-to-day functions required to be an adequate parent. Her view was that he lacks the "emotional, psychological, physical or financial means" to provide minimal parental care to his children. She noted his transitory lifestyle, psychiatric history, and history of substance abuse. She explained:

> While finances and a residence could be secured, it is apparent that [L.R.'s] emotional and psychological functioning would hinder him from being independently effective in managing the day to day responsibilities of caring for [C.H.] and [R.H.].... Moreover, given the instability in his own life demonstrated in his psychological functioning, transient living situations, and need for "rest periods," it is clear that [L.R.] would be apt to fail at providing a stable home environment for the children.

Consistent with the evidence, the trial court found that L.R. failed to perform any parenting functions or to provide nurture and support for his children, explaining these circumstances at length.

The Appellate Division based its reversal of the trial court in large part on its rejection of the testimony of Dr. Wells. The Appellate Division criticized Dr. Wells for her use of the Millon Clinical Multiaxial Inventory–II test (MCMI–II), claiming that the inventory was skewed toward the negative elements of the patient's psyche. 309 *N.J.Super.* at 190, 706 *A.*2d 1129. The Appellate Division misconstrued the expert's report and applied the wrong standard of review.

Dr. Wells administered a personal interview and evaluation of L.R. in addition to the MCMI–II.[5] The test revealed a moderate

---

[5] Dr. Wells explained the purpose of the latter test:

> [T]he reader is cautioned to keep in mind the emphasis on pathology, purposefully constructed by the authors of the test so as to optimize clinical utility. Rather than focus on more marked but essentially transitory symp-

level of pathology in L.R., finding him to be self-defeating, submissive, dependent, and overly compliant and indulging. Dr. Wells's report, however, was not overwhelmingly negative. She noted that "there is no doubt" that L.R. loves his children. In respect of L.R.'s wish for reunification, Dr. Wells acknowledged that "the presence of blood related persons is highly valued and deemed a significant element in [L.R.]'s life." Nevertheless, she determined that breaking the children's bond with their foster family would cause substantial and enduring harm to the children. Further, in her opinion, the children would not be significantly harmed by a cessation of contact with L.R., who at that time had not visited them in six months. The expert concluded that L.R.'s parental rights should be terminated, explaining that she "cannot support or prioritize [L.R.]'s need for family over the children's needs for a stable family and home environment."

The trial court found Dr. Wells to be "extremely credible" and "most balanced" in her opinions. In these circumstances, we rely on the trial court's acceptance of the credibility of the expert's testimony and the court's fact-findings based thereon, noting that the trial court is better positioned to evaluate the witness' credibility, qualifications, and the weight to be accorded her testimony. *Bonnco Petrol, Inc. v. Epstein,* 115 *N.J.* 599, 607, 560 *A.*2d 655 (1989). There is no basis in the record to indicate that the expert's findings were erroneous or suspect. The expert was well qualified, her evaluation addressed all the relevant issues, and her conclusions were supported by other facts in the record. *J.C., supra,* 129 *N.J.* at 19, 608 *A.*2d 1312.

The Appellate Division found that the record did not empirically support Dr. Wells' predictions regarding L.R.'s inability to provide adequate parenting for his children. The record, however, amply supports that finding. L.R. has never been able to provide adequate parenting for his children. He allowed them

---

toms, the MCMI–II stresses habitual, maladaptive ways of relating, thinking, behaving, and feeling.

to be neglected and to live in conditions that DYFS caseworkers described as "deplorable." Although there seems to be no question that he loves them, he was not able to fulfill any of his parental duties and has allowed the children to languish in foster care for many years without a permanent home. The record supports the finding that L.R. will not be able to provide a safe and stable home for the children in the near future.

Courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect. *A.W., supra,* 103 *N.J.* at 616 n. 14, 512 *A.2d* 438. The trial court found that a delay in establishing a stable and permanent home will cause harm to both these children. The lack of a permanent, safe, and stable home has already engendered significant harm to C.H. *See New Jersey Div. of Youth & Family Servs. v. B.G.S.,* 291 *N.J.Super.* 582, 591–93, 677 *A.2d* 1170 (App.Div.1996) (holding that parent's failure to provide a permanent home or identity, causing child to suffer psychological damage, may authorize termination of parental rights). There is every indication that similar harm may befall R.H.[6] Dr. Wells also specifically testified that separation from her foster parents will cause C.H. serious and enduring harm. *J.C., supra,* 129 *N.J.* at 19, 608 *A.2d* 1312.

We find that the trial court was presented with clear and convincing evidence that L.R.'s failure to take responsibility for his children and to perform any substantial parental functions caused harm to the children, endangering their health and development, and that he has been either unable or unwilling to remedy the circumstances giving rise to this harm. *N.J.S.A.* 30:4C–15.1(a)(1) and (2). Therefore, we determine that both the first and second elements of the best interests of the child standard have been met.

---

[6] We note that in her 1998 report, Dr. Nadelman found R.H. to have suffered "drug related prenatal damage which likely resulted in his Attention Deficit Hyperactivity Disorder, as well as postnatal trauma involving multiple moves, dislocation and family discord." We make no determination, however, based on that report. *Supra* at 375 n. 2, 736 *A.2d* at 1266 n. 2.

## B.

DYFS must show, as the fourth element of the best interests standard, that "termination of parental rights will not do more harm than good." *N.J.S.A.* 30:4C–15.1(a)(4). This criterion is related to the first and second elements of the best interests standard, which also focus on parental harm to the children. *N.J.S.A.* 30:4C–15.1(a)(1) and (2). The latter specifically defines "harm" as "includ[ing] evidence that separating the child from his foster parents would cause serious and enduring emotional or psychological harm to the child." *N.J.S.A.* 30:4C–15.1(a)(2).

 It is evident from this factual record that severing C.H.'s relationship with her biological father, L.R., will not do her more harm than good. As we have explained in the companion case, *K.H.O., supra,* 161 *N.J.* at 354–55, 736 *A.2d* at 1255, a harm arising out of the severing of ties with the biological parent is an inherent danger of termination proceedings. The near inevitability of this harm befalling a child is the tragedy that termination proceedings engender. Nevertheless, the question the courts must answer remains whether the termination will not do more harm than good. *N.J.S.A.* 30:4C–15.1(a)(4).

The expert testimony has amply demonstrated that this fourth element of the best interests standard has been met in respect of C.H. Dr. Wells concluded that breaking the bond with her foster family would cause substantial and enduring harm to C.H., and that she would not be significantly harmed by a cessation of contact with L.R. In addition, it is in C.H.'s best interests to be given the opportunity to have a permanent and stable home. We note, too, that C.H. is fortunate to have such an alternative, because her foster parents are willing to adopt her. *See K.H.O., supra,* 161 *N.J.* at 358–59, 736 *A.2d* at 1257 (noting that termination of parental rights does not always lead to permanent placement); *A.W., supra,* 103 *N.J.* at 610–11, 512 *A.2d* 438 (warning that courts should hesitate to terminate parental rights in absence of permanent alternative placement).

As for R.H., Dr. Wells did not perform a bonding or psychological evaluation of the child, although she was able to conclude that R.H. does not really know L.R. and characterized R.H. as a "special needs" child.[7] The evidence, however, generates a strong inference that, comparatively, R.H. would suffer less harm from the termination of his parent's rights then from the termination of his relationship with his foster parents. Nevertheless, in the absence of a full psychological evaluation, the initial expert opinion provides an unsure basis for termination of parental rights. *See J.C., supra,* 129 *N.J.* at 19, 608 *A.*2d 1312. The subsequent expert's report, however, did contain a thorough psychological and bonding evaluation of R.H. that is the kind of relevant evidence necessary to render an informed determination of the comparative harm that will result from the termination of parental rights. Dr. Nadelman found that R.H. and his foster mother, who wishes to adopt him, have a parent-child attachment and that she is his "psychological mother and is really the only mother he has known or can remember." She reported R.H. to be impulsive and aggressive, like his older siblings. Dr. Nadelman found R.H.'s current foster care placement to be "an acceptable, if not ideal adoptive home" for him, and also opined that he would suffer "significant regression" if he were removed from that home. Evidence consistent with Dr. Nadelman's opinion would strongly support and impel the conclusion that the severing of R.H.'s ties with his foster mother would cause him significant, perhaps irreparable, harm.

In considering whether these children have suffered parental harm under the comprehensive criteria of *N.J.S.A.* 30:4C–15.1(a)(1) and (2), as well as (4), we are mindful of strong policy considerations that underscore the need to secure permanency and stability for the child without undue delay. *See K.H.O.,*

---

[7] The Appellate Division found Dr. Wells's evaluation suspect because she failed to do a bonding evaluation between R.H. and C.H.'s foster parents, who had expressed an interest in adopting him, but nevertheless recommended that R.H. be placed with them. 309 *N.J.Super.* at 192, 706 *A.*2d 1129.

*supra*, 161 *N.J.* at 356–58, 736 *A.*2d at 1256–57. As Dr. Wells pointed out, this father's need to maintain connection with his children should not override the children's requirements for stability and permanency. We appreciate, however, the importance of biological ties, and recognize that a foster family may permit the children to maintain their connection with their biological father. Such continued contact between a biological parent and the adopted child, sometimes referred to as "open-adoption," may affect the stability and permanency of the child in his new home. *K.H.O., supra,* 161 *N.J.* at 360–61, 736 *A.*2d at 1258; *L.A.S., supra,* 134 *N.J.* at 140, 631 *A.*2d 928; *A.W., supra,* 103 *N.J.* at 610, 512 *A.*2d 438. Open adoption, that is, a voluntary arrangement or agreement providing for continued contact with biological parents after the termination of parental rights, has yet to be approved of by the Legislature. *K.H.O., supra,* 161 *N.J.* at 360–62, 736 *A.*2d at 1258–59. While we continue to decline to enforce open adoption agreements because of the sensitive and complex issues of public policy such a decision raises, we approve of informal and voluntary agreements for visitation by biological parents provided they are fully counselled, mutually undertaken, and in the best interests of the children involved. *Id.* at 362–63, 736 *A.*2d at 1259–60.

## C.

L.R.'s primary contention in this appeal is that DYFS failed to undertake diligent efforts on his behalf to enable him to become the custodial parent or primary caretaker of his children. The third element of *N.J.S.A.* 30:4C–15.1(a) provides:

> (3) The division has made diligent efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights[.]

The statutory definition of "diligent efforts" is "reasonable attempts by an agency authorized by the division to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure."

*N.J.S.A.* 30:4C–15.1(c).[8] Such "reasonable attempts" at reunification include:

(1) consultation and cooperation with the parent in developing a plan for appropriate services;

(2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;

(3) informing the parent at appropriate intervals of the child's progress, development and health; and

(4) facilitating appropriate visitation.

[*N.J.S.A.* 30:4C–15.1(c).]

The New Jersey Administrative Code also provides guidelines for the diligent efforts of DYFS to reunite families. *N.J.A.C.* 10:133I–4.2. Those guidelines require that DYFS provide services to the family according to a case plan, including enlisting the assistance of relatives, providing direct services, or providing referrals to community services providers. *N.J.A.C.* 10:133I–4.2(a). The guidelines provide that DYFS must monitor the services, change them as needs arise, and identify and strive to overcome "barriers to service provision or service utilization." *N.J.A.C.* 10:133I–4.2(b)(2).

Our understanding of the required scope of these administrative efforts is informed by an examination of similar provisions across the country. Although many states require that social service agencies engage in "reasonable" or "diligent" efforts to reunite families, few state legislatures have offered concrete definitions of the terms. Judicial approaches to what constitute reasonable efforts by a social service agency on behalf of parents encompass a wide spectrum. In some states, social service agencies must make "every effort" to reunite families. *State v. Robert H.,* 118 *N.H.*

---

[8] A recent legislative revision of the Title 30 statutes has changed the term from "diligent efforts" to "reasonable efforts." *L.* 1999, *c.* 53, § 23; § 29 (C.30:4C–15(d)); § 30 (C.30:4C–15.1). Because these amended laws are effective as of April 1, 1999, they are not applicable to the case before us, which was first heard in 1996. Additionally, because the definition of "reasonable efforts" remains the same as that of "diligent efforts" in the previous version of the statute, the revision would not affect our analysis of DYFS's efforts on behalf of this family.

713, 393 *A*.2d 1387, 1391 (1978); *see also In the Matter of Sheila G.*, 61 *N.Y.*2d 368, 474 *N.Y.S.*2d 421, 462 *N.E.*2d 1139, 1147 (1984) (stating that social welfare agencies are required to provide counseling for psychological, physiological, and financial problems; assist in planning for child's future; aid in procurement of housing and employment; and arrange for regular and meaningful visitation with child); *Weaver v. Roanoke Dep't of Human Resources*, 220 *Va.* 921, 265 *S.E.*2d 692, 697 (1980) (requiring assistance to remedy father's financial inability to care for children).

Some state courts will take the agency's efforts into account only in limited circumstances. *Petition of the Dep't of Pub. Welfare*, 376 *Mass.* 252, 381 *N.E.*2d 565, 574–75 (1978) (ruling that dismissal of child custody petition is warranted only where agency action was "arbitrary and irrational"). Other state courts have refused to make a social service agency's reasonable efforts at reunification a condition precedent to termination at all. *In the Matter of McDaniel*, 46 *Or.App.* 65, 610 *P.*2d 321, 324 (1980) ("The statutory requirement that available social agencies ... make 'reasonable efforts' to help the parent make a lasting adjustment could not have been intended by the legislature as a justification for penalizing the child for [the agency's] lapse.").

On the federal level, the recent trend has been to limit the reasonable efforts social service agencies must undertake to reunite families. Thus, the Adoption and Safe Families Act of 1997 provides that the child's health and safety are the paramount concern in attempts to reunify families. 42 *U.S.C.* § 671(a)(15)(A). Although reasonable efforts are still required by the Act, there are also numerous exceptions to an agency's duty to provide reasonable reunification efforts, such as when the parent has physically endangered the child. 42 *U.S.C.* § 671(a)(15)(D)(I). These changes were spurred by congressional concern that the efforts of social service agencies to reunite families often returned children to dangerous homes. 143 *Cong. Rec.* H10776–05, H10788 (daily ed. Nov. 13, 1997) (statement of Rep. Kennelly) ("Unfortunately, in practice, reasonable efforts became every effort, putting a child

at risk. So we are now telling States there are times when returning a child home presents too great a risk to that child's safety, and that is not a risk that we are willing to take."). *Cf. DeShaney v. Winnebago County Dep't of Social Servs.*, 489 *U.S.* 189, 109 *S.Ct.* 998, 103 *L.Ed.*2d 249 (1989) (holding that state agencies have no constitutional duty to protect child from his father after receiving numerous and repeated reports of abuse). Some commentators have criticized this approach, arguing that services such as targeted reunification programs, drug rehabilitation, and long term services programs, have been useful in producing lower levels of maltreatment and higher rates of reunification. *See* Robert M. Gordon, *Drifting Toward Byzantium: The Promise and Failure of the Adoption and Safe Families Act*, 83 *Minn. L.Rev.* 637, 701 (1999).

This Court considered the diligent efforts standard in *K.L.F.*, *supra*, 129 *N.J.* at 47, 608 *A.2d* 1327. There, the Court emphasized that assisting the parent's efforts to reunify the family is both a central and paramount consideration in determining the diligence of DYFS's efforts. In that case, DYFS had improperly denied a mother visitation with her infant child in the one year period prior to initiating proceedings to terminate her parental rights. *Ibid.* The mother had no home or work and was not contacted by DYFS for a year and a half. Although the trial court characterized that mother's efforts as "ineffectual, paltry and meager," this Court found that the mother had attempted to contact DYFS and when she finally reached DYFS and was able to be a caretaker for the children, she was refused visitation. We cautioned that "those in the child welfare system not tip the scales and encourage a foster parent-child bond to develop when the natural parent is both fit and anxious to regain custody." *Id.* at 46, 608 *A.2d* 1327. The refusal to provide or allow an able and willing parent contact with her child is tantamount to a unilateral displacement of the biological parent, which is impermissible without judicial approval. *Id.* at 40, 608 *A.2d* 1327; *see also In re La Freniere*, 420 *A.2d* 82, 84 (R.I.1980) (holding that social service agency's attempt to discourage visitation between biological par-

ents and children is irreconcilable with agency's statutory duty "to encourage and strengthen the parental relationship").

The critical holding of *K.L.F., supra*, regarding the "diligent efforts" requirement, is that DYFS must encourage, foster and maintain the bond between the parent and child as a basis for the reunification of the family. DYFS must promote and assist in visitation and keep the parent informed of the child's progress in foster care. DYFS should also inform the parent of the necessary or appropriate measures he or she should pursue in order to continue and strengthen that relationship and, eventually, to become an effective caretaker and regain custody of his or her children. *N.J.S.A.* 30:4C-15.1(c); *In re Laura F.*, 33 *Cal.*3d 826, 191 *Cal.Rptr.* 464, 662 *P.*2d 922 (1983) (finding reasonable efforts requirement met when agency counseled parent on changes she needed to make in order to regain custody).

Like considerations of parental fitness, an evaluation of the efforts undertaken by DYFS to reunite a particular family must be done on an individualized basis. *See L.A.S., supra*, 134 *N.J.* at 139, 631 *A.*2d 928. Services that may address one family's needs will not be helpful to another. Whether particular services are necessary in order to comply with the diligent efforts requirement must therefore be decided with reference to the circumstances of the individual case before the court, including the parent's active participation in the reunification effort. *In re Tricia and Trixie H.*, 126 *N.H.* 418, 493 *A.*2d 1146 (1985) (requiring minimum level of active efforts by parents); *In re Kristen B.*, 558 *A.*2d 200, 202 (R.I.1989) ("When planning for reunification with a child, the parent not only should establish and comply with a plan that can provide a sound and constructive family life, but must also perform some minimal act toward the fulfillment of that plan."); *Adoption of Mario*, 43 *Mass.App.Ct.* 767, 686 *N.E.*2d 1061, 1066 (1997) (holding that duty of agency is to engage in reasonable efforts contingent upon mother's fulfillment of her own parental responsibilities and cooperation with agency). Therefore, other services, including those provided in conjunction with the

reunification plan developed by DYFS, such as day care, housing assistance, referrals to drug treatment or medical and health care, parenting classes, financial assistance, and the like, must be evaluated on a case-by-case basis.

DYFS's efforts to reunite these children with their parents, K.H. and L.R., were reasonable under the circumstances, particularly when properly viewed in light of DYFS's efforts on behalf of this family as a whole. DYFS's efforts should not be discounted by the courts due to K.H.'s death. DYFS caseworkers had been providing services to this family since 1991. DYFS consistently attempted to remove or ameliorate the circumstances that necessitated state intervention in this family. In the beginning, DYFS directed efforts only towards the children and K.H. Despite the fact that L.R. lived in the same building as K.H., in close proximity to her and the children from 1990 to 1993, he did not come forward as the father of C.H. Although DYFS caseworkers were unable to direct services specifically to him, the assistance provided to K.H. and the children did not exclude L.R. and, in fact, indirectly helped him as a parent.

When L.R. finally did come forward in 1993 as the biological father of C.H. and R.H., he told the DYFS caseworker that he would eventually like to care for all four children, although he could not do so at that time because of his unstable housing situation and meager income. To assist L.R., DYFS promptly set up bi-monthly visitation and encouraged a continuing parent-child relationship between L.R. and his children. DYFS caseworkers also attempted to ascertain whether L.R. had any relatives who might be able to care for his children in the meantime. DYFS had referred K.H. to the Elizabeth Housing Authority to improve the family's housing situation, and later referred L.R. to Legal Aid for housing assistance. In January 1994, when K.H. allegedly assaulted L.R., DYFS referred L.R. to Legal Aid for legal assistance and to obtain a restraining order against K.H., which L.R. did secure. DYFS also referred L.R. to a domestic violence program for battered persons. Thereafter, L.R. independently

received psychiatric and substance abuse treatment on several occasions.

During the short time that L.R. was living with K.H., DYFS's efforts to assist K.H. included L.R. by benefitting him with the opportunity to be involved in the family's reunification. When K.H. moved out, DYFS caseworkers continued to pursue the basic plan of reuniting the children with K.H. as the primary caretaker, but that effort never excluded, discouraged or interfered with L.R.'s ability to remain a part of his children's lives, to maintain a relationship with them, or to participate in their care.

L.R. only sporadically expressed the desire to care for his children, but he consistently failed to seek or take meaningful measures to enable him to do so, and often frustrated DYFS caseworkers' attempts to help him. For example, when L.R. obtained the restraining order for domestic violence at the suggestion of DYFS, he did not inform DYFS that he had done so, nor did he elicit any further assistance from DYFS in helping him to deal with this divisive family problem. In October 1994, when L.R. once more informed DYFS that he wanted the children, DYFS requested that L.R. and his girlfriend complete police reports as a necessary preliminary step to gaining custody; despite several reminders from DYFS, L.R. never furnished those reports.

Even prior to K.H.'s death, these parents evidenced an inability to provide any care for their children, which resulted in the children's transfer to the Adoption Resource Center, without objection from either parent. L.R., in fact, told a DYFS caseworker that he would be willing to let his children be adopted if he could continue to have weekly visits with them; nevertheless, he failed to visit the children between November 1995 and May 1996. In February 1996, L.R. failed to arrive at a meeting with DYFS caseworkers to consider the status of the children; DYFS moved to terminate L.R.'s parental rights in March.

We find that DYFS's efforts to assist L.R. in his role as a parent were sufficient, including: regular visitation; encourage-

ment of an ongoing parent-child relationship; allowing L.R.'s inclusion and cooperation with K.H. in her parental role; assistance in respect of domestic violence; and referrals to obtain housing. As for psychiatric hospitalizations and care, as well as drug detoxification programs, L.R. was able to obtain these independently through state sponsored programs and services.

The diligence of DYFS's efforts on behalf of a parent is not measured by their success. Thus, the parent's failure to become a caretaker for his children is not determinative of the sufficiency of DYFS's efforts at family reunification. These efforts must be assessed against the standard of adequacy in light of all the circumstances of a given case. Consistent efforts to maintain and support the parent-child bond are central to the court's determination. L.R.'s continuing bond with C.H. and R.H. is indicative that DYFS's efforts in this regard were not only diligent but properly directed.

In a situation such as this, where one parent has been the custodial parent and takes the primary or dominant role in caring for the children, it is reasonable for DYFS to continue to focus its efforts of family reunification on that custodial parent, so long as DYFS does not ignore or exclude the non-custodial parent. A different approach may be necessary where two biological parents are hostile to one another. Where, however, the parents are cooperative, DYFS's efforts should be considered in terms of the family as a whole in determining whether those efforts have been diligent within the meaning of *N.J.S.A.* 30:4C–15.1(a)(3).

We find DYFS's efforts to have been diligent in light of this family's circumstances.

IV

In conclusion, we disagree with the Appellate Division's determination that the order of termination of parental rights over C.H. is not supported by the facts of this case. There was clear and convincing evidence to support a finding of harm that endangered

the health and development of both C.H. and R.H. *N.J.S.A.* 30:4C–15.1(a)(1). There was also ample evidence that L.R. was unable or unwilling to provide a safe and stable home for both of these children and that a delay in permanent placement will add to the harm they have already suffered. *N.J.S.A.* 30:4C–15.1(a)(2). There was sufficient evidence that termination of parental rights will not do C.H. more harm than good. *N.J.S.A.* 30:4C–15.1(a)(4). The determination of the sufficiency of the evidence that termination of parental rights will not do R.H. more harm than good is premature and will require supplementation through the introduction into evidence of additional expert evaluations. Finally, we find that DYFS engaged in diligent efforts to reunite this family. *N.J.S.A.* 30:4C–15.1(a)(3).

The judgment of the Appellate Division in respect of L.R.'s parental claims to C.H. is reversed and the order terminating L.R.'s parental rights as to C.H. is to be reinstated. The judgment of the Appellate Division in respect of the termination of L.R.'s parental rights as to R.H. is reversed and the matter remanded limited to consideration and determination of the comparative harm to R.H. as a result of the termination of parental rights of L.R., in accordance with this opinion. We do not retain jurisdiction.

O'HERN, J., concurring.

I concur in the judgment of the Court. My reasoning is essentially set forth in the companion case of *In re Guardianship of K.H.O.,* 161 *N.J.* 337, 736 *A.2d* 1246 (1999), also decided today.

In this case, the Appellate Division correctly held that the standard for termination of parental rights had not been established by the requirement of clear and convincing evidence. 309 *N.J.Super.* at 192, 706 *A.2d* 1129 (1998). The trial record failed to establish convincingly the third prong of the standard for termination of parental rights, that the Division of Family and Youth Services (DYFS) made "diligent efforts to provide services to help the parent correct the circumstances which led to the child's

placement outside the home and the court has considered alternatives to termination of parental rights[.]" *N.J.S.A.* 30:4C–15.1(a)(3).[1]

It is clear that any attention given to the father was an afterthought. Again, with the benefit of hindsight derived from the reports received following the Appellate Division decision (and oral arguments before this Court), we can now determine that the statutory standards have been met. The supplementary reports found that the father's "functioning has deteriorated over the last [six] months during which he said he was highly motivated to gain custody. . . . Although there is strong caring and affection between [the father] and his children, he has been unable to use this to help him to mobilize his resources for recovery." As noted in the report, he can neither care for nor protect these children, who have special emotional and educational needs. He has lost his job and his home, in part because he has become readdicted to drugs. The father is "a psychiatrically disturbed substance abuser who has had this condition for many years" and whose recovery is regarded as being "guarded, at best[.]" Even if he were to completely recover, which is unlikely, he would not be able to assume responsibility for any of the children for at least one additional year.

"Despite his love for the children, his chronic emotional disturbance and substance abuse have rendered him incapable of taking care of himself or providing . . . minimally adequate care, nurturing, stability, protection or guidance for his children." These children "have been waiting . . . since their births" for their father to attain a level of functioning that would enable him to care properly for them. Their childhoods have suffered long enough. As recommended in the report, their best interests would truly be

---

[1] As explained by the majority, the Legislature amended the statute to require reasonable efforts rather than diligent efforts. *Ante* at 381 n. 5, 736 *A.*2d at 1269 n. 5.

best served if they were "free to be adopted and achieve the permanence and security they require."

*Concur in result*—Justice O'HERN.

*For reversal and reinstatement in part; reversal and remandment in part*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.