# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0587-16T4

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

W.L.,

    Defendant-Appellant,

and

J.J.,

    Defendant.

_____

IN THE MATTER OF THE GUARDIANSHIP
OF S.K.L., a minor.

_____

        Submitted May 23, 2017 — Decided June 21, 2017

        Before Judges Fisher and Leone.

        On appeal from Superior Court of New Jersey,
        Chancery Division, Family Part, Mercer County,
        Docket No. FG-11-39-16.

        Joseph E. Krakora, Public Defender, attorney
        for appellant (Louis W. Skinner, Designated
        Counsel, on the brief).

Christopher S. Porrino, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Melvina D. Fennell, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Lisa M. Black, Designated Counsel, on the brief).

PER CURIAM

W.L. ("Mother") appeals the September 20, 2016 judgment terminating her parental rights over her daughter S.K.L. In her oral opinion, Judge Audrey Peyton Blackburn found the New Jersey Division of Child Protection and Permanency ("Division") satisfied the best-interests test under N.J.S.A. 30:4C-15.1(a). We affirm.[1]

I.

The trial court's oral decision found the following facts. S.K.L. was born in June 2014. Mother has four other children, born in 2004, 2007, 2011, and 2013. Mother was twice substantiated for abuse or neglect regarding other children and lost custody of her four other children.

The Division has been involved with Mother since October 2005 based on concerns regarding Mother's use of drugs and alcohol. Moreover, Mother has made three suicide attempts and has previously

---

[1] The trial court also terminated the parental rights of the biological father, J.J. (Father). The termination of his rights is not at issue in this appeal.

been hospitalized for depression. The Division found Mother to need treatment for alcohol abuse and a mental health evaluation. In November 2013, Dr. Alan S. Gordon performed a psychological evaluation of Mother. Dr. Gordon found she had a severe mental disorder. His diagnoses included that she suffered from major depression with psychotic features, post-traumatic stress disorder, and general anxiety disorder. He recommended Mother attend individual psychotherapy as well as parenting classes.

In June 2014, just three days after her birth, the Division removed S.K.L. from Mother's care due to untreated mental health concerns. The trial court granted the Division custody. A few weeks after her birth, S.K.L. was placed with her current caregiver, an unrelated resource parent.

After a psychological evaluation, Mother completed domestic violence counseling and parenting classes as recommended. Initially, Mother attended supervised visits with S.K.L. However, in November 2014, after an incident with Father, Mother stopped attending services and was terminated from several programs.

The trial court also ordered Mother to have individual therapy, but she failed to do so. In December 2014, Mother was sent for counseling at Greater Trenton Behavioral Health, but her attendance was sporadic and she insisted she did not need therapy. She was also sent to a psychiatrist for counseling and medication

A-0587-16T4

monitoring, but she never took her medication. Mother's visitation with S.K.L. became inconsistent, and she was terminated by the agency which supervised her visits. Visitation resumed under the supervision of the Division, but Mother attended sporadically and then stopped attending visitation and other services. When trial commenced, she had not visited S.K.L. for about ten months.

Mother never completed any mental health services. Mother admitted in her testimony that she had not completed services at Greater Trenton Behavioral Health, as she did not believe she needed its services.

Following the August 2016 trial, the trial court credited and adopted the testimony of the Division's psychologist Dr. Brian Scott Eig and caseworkers Yonely Rosa and Kimberly Noel. The court terminated Mother's parental rights. Mother appeals.

## II.

"Appellate review of a trial court's decision to terminate parental rights is limited[.]" In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002). Our task is to determine whether the decision "is supported by '"substantial and credible evidence" on the record.'" N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012) (citation omitted). "We ordinarily defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the

witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (citation omitted).

"Particular deference is afforded to family court fact-finding because of the family courts' special jurisdiction and expertise in family matters." N.J. Div. of Child Prot. & Permanency v. N.C.M., 438 N.J. Super. 356, 367 (App. Div. 2014) (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)), certif. denied, 222 N.J. 18 (2015). Thus, "[w]e will not overturn a family court's factfindings unless they are so '"wide of the mark"' that our intervention is necessary to correct an injustice." F.M., supra, 211 N.J. at 448 (citation omitted). We must hew to our deferential standard of review.

## III.

"A parent's right to enjoy a relationship with his or her child is constitutionally protected." In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). However, this protection "is tempered by the State's parens patriae responsibility to protect the welfare of children." Id. at 347; see N.J.S.A. 30:4C-1(a).

Under Title Thirty, the Division must prove by clear and convincing evidence that termination of parental rights is in the

best interest of the child.  N.J.S.A. 30:4C-15(c); F.M., supra, 211 N.J. at 447.  The Division must show:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm.  Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

A.

We first address whether the Division presented clear and convincing evidence to satisfy prongs one and two of the best-interests test.  The first two prongs "relate to the finding of harm arising out of the parental relationship."  In re Guardianship of DMH, 161 N.J. 365, 378 (1999).  They "are related to one another, and evidence that supports one informs and may support

the other as part of the comprehensive basis for determining the best interests of the child."  Id. at 379.

The first prong "requires that the State demonstrate harm to the child by the parent" in the form of "endangerment of the child's health and development resulting from the parental relationship."  K.H.O., supra, 161 N.J. at 348.  The second prong requires the Division show "the harm is likely to continue because the parent is unable or unwilling to overcome or remove the harm."  Ibid.

"Mental illness, alone, does not disqualify a parent from raising a child.  But it is a different matter if a parent refuses to treat [her] mental illness, [and] the mental illness poses a real threat to a child[.]"  F.M., supra, 211 N.J. at 450-51.  Mother's mental illness, which she refused to treat, prevented her from parenting S.K.L. since she was born in 2014.  "A parent's withdrawal of [parental] solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child."  DMH, supra, 161 N.J. at 379.

We have held that "suffering from mental disorders which adversely affect [one's] ability to parent" can be sufficient evidence to satisfy the first prong. N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 440 (App. Div. 2001), certif.

denied, 171 N.J. 44 (2002).  Moreover, if the parents lack "the mental status sufficient to eliminate the risk of future harm to the child," that speaks to "whether the child's safety, health or development will be endangered in the future and whether the parents are or will be able to eliminate the harm" under the second prong.  Ibid.

Dr. Eig conducted a psychological and parenting fitness evaluation of Mother.  He testified that, despite her history of mental health problems, Mother "did not believe she needed services or treatment."  He found Mother "showed some significant reality testing difficulties, some difficulties with being able to think clearly and accurately.  She did not appear to see the world the way most other people do."  As a result, she tended to misperceive herself and others and did "not make good judgments."

Given Mother's sixth-grade education and "below average level of intellectual functioning," Dr. Eig found Mother "would struggle with being able to understand the child's emotional and behavioral needs" and "she would have difficulty problem-solving the more complex and ambiguous situations that often arise during childcare."  He concluded Mother, "who is inflexible and has longstanding difficulties, is not supported as a caregiver for a child now or in the foreseeable future."  Dr. Eig testified he "would not support [Mother] as being an independent or sole parent

to a minor child, nor would [he] expect her parenting fitness to change appreciably in the foreseeable future." This is sufficient evidence that Mother "would be unable to protect and care for [S.K.L.] on a daily basis." Id. at 436.

Although Mother completed other services, she did not believe she needed mental health services and admitted she had not completed any mental health services. Thus, Mother was "unwilling or incapable of obtaining appropriate treatment" for her mental health issues. N.J. Div. of Youth & Family Servs. v. H.R., 431 N.J. Super. 212, 223 (App. Div. 2013).

The trial court gave little credence to Mother's "litany of inadequate excuses" for not complying with services. We agree, and note Mother's excuses demonstrated the low priority she placed on visiting S.K.L. and receiving services which would have helped her remediate the conditions which kept S.K.L. from her care.[2] Her lack of effort to complete any mental health services, and her belief that she did not require the services despite multiple recommendations, evidenced that Mother was "unwilling or unable to eliminate the harm facing the child" stemming from her mental health issues. N.J.S.A. 30:4C-15.1(a)(2).

---

[2] For example, Mother admitted missing visitation services to go drinking with friends in New York.

Further, "proof of the abuse or neglect of a sibling is admissible in considering harm to a child in a Title 30 Proceeding." Div. of Child Prot. & Permanency v. T.U.B., __ N.J. Super. __, __ (2017) (citing J. v. M., 157 N.J. Super. 478, 493 (App. Div.), certif. denied, 77 N.J. 490 (1978)). "All any court can rely upon in determining whether to sever parental rights is the parents' past course of conduct, whether to the child in question or to other children in their care." J., supra, 157 N.J. Super. at 493. Here, S.K.L.'s four older siblings had already been removed, and Mother had been substantiated for neglect on several occasions. "We cannot conceive that the Legislature intended to guarantee to parents at least one chance to [neglect] or abuse each child." Ibid.

Mother claims she obtained a stable place to live in September 2015. She argues the trial court "did not completely address" her housing situation. In fact, the court did not rely on Mother's housing situation. When the court noted "[n]either of [S.K.L.]'s biological parents is able to provide a safe and stable home for this child," the court was referring to Mother's failure to complete mental health services and her refusal to acknowledge she had a problem.

The trial court found Mother had not remediated the circumstances which lead to S.K.L.'s removal. We find there was

sufficient evidence to support the court's finding that the Division satisfied prongs one and two.

B.

To satisfy prong three, the Division must have "made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3).

The trial court found the Division made reasonable efforts, as detailed in "the credible testimony" of Rosa and Noel. Mother was given a psychological evaluation and was sent to a psychiatrist for counseling and medication monitoring. She was provided with domestic violence counseling and parenting classes. The Division continuously provided supervised visitation with S.K.L., often changing supervisors and locations to accommodate Mother and address her concerns about Father. Mother was provided counseling at Greater Trenton Behavioral Health. She was given repeated opportunities to receive mental health treatment.

Mother's refusal to engage in certain services, her non-compliance, and the lack of effectiveness of the programs provided is not a measure of the Division's effort. "'The diligence of [the Division]'s efforts on behalf of a parent is not measured by' whether those efforts were successful." F.M., supra, 211 N.J. at

452 (citation omitted). Rather, the Division's efforts are measured "against the standard of adequacy in light of all the circumstances of a given case." DMH, supra, 161 N.J. at 393. Here, there was sufficient evidence for the trial court to find the Division satisfied prong three.

Mother also argues the Division failed to consider her brother, J.L., whom she referred as a possible placement for S.K.L. The Division is required to explore relative placements:

> In any case in which the [Division] accepts a child in its care or custody, including placement, the department shall initiate a search for relatives who may be willing and able to provide the care and support required by the child. . . . The search will be completed when all sources contacted have either responded to the inquiry or failed to respond within 45 days. The [Division] shall complete an assessment of each interested relative's ability to provide the care and support, including placement, required by the child.
>
> [N.J.S.A. 30:4C-12.1(a) (emphasis added).]

"The Division must perform a reasonable investigation of such relatives that is fair, but also sensitive to the passage of time and the child's critical need for finality and permanency." N.J. Div. of Youth & Family Servs. v. J.S., 433 N.J. Super. 69, 87 (App. Div. 2013), certif. denied, 217 N.J. 587 (2014).

Mother testified she talked to J.L. about S.K.L.'s placement and provided the Division with his cellphone number. Rosa

12                                                          A-0587-16T4

testified she telephoned J.L. and left a voicemail, but he never returned her call. Moreover, Mother did not provide J.L.'s address or other identifying information. "[A] parent can[not] expect the Division to locate a relative with no information[.]" N.J. Div. of Youth & Family Servs. v. K.L.W., 419 N.J. Super. 568, 582 (App. Div. 2011). Without this information, and without any response or expression of interest from J.L., the Division's efforts were reasonable.[3]

Further, Mother alleges kinship legal guardianship was never explored by the Division. A court must appoint a caregiver as a kinship legal guardian if "adoption of the child is neither feasible nor likely." N.J.S.A. 3B:12A-6(d)(3). Here, the current caregiver stated her "desire to adopt, [so] the statutory requirement that adoption is neither feasible nor likely is not satisfied." H.R., supra, 431 N.J. Super. at 230—31.

C.

To satisfy the fourth prong, the Division must prove by clear and convincing evidence that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). Prong four "serves as a fail-safe against termination even where

---

[3] Rosa believed J.L. was in a severe car accident shortly thereafter and was in a coma for a month. Mother states it was a different brother who was in the car accident. Even if true, J.L. still failed to respond to the Division's call.

A-0587-16T4

the remaining standards have been met." <u>N.J. Div. of Youth & Family Servs. v. G.L.</u>, 191 <u>N.J.</u> 596, 609 (2007).

Generally, to satisfy the fourth prong, the Division should present comparative bonding "'testimony of a well qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship' with the natural parents and the foster parents." <u>N.J. Div. of Youth & Family Servs. v. R.G.</u>, 217 <u>N.J.</u> 527, 559 (2014) (quoting <u>In re Guardianship of J.C.</u>, 129 <u>N.J.</u> 1, 19 (1992)). Here, the court scheduled a bonding evaluation for Mother, but she failed to appear. We find this is one of the "few scenarios in which comparative evaluations would not be required." <u>N.J. Div. of Youth & Family Servs. v. A.R.</u>, 405 <u>N.J. Super.</u> 418, 440 (App. Div. 2009).

Dr. Eig testified there "was a secure, warm and strong attachment" between S.K.L. and her resource parent. S.K.L. had been with the resource parent since she was one month old, and she was her psychological parent. Dr. Eig found S.K.L. "would be at relatively high risk for suffering severe and enduring psychological or emotional harm if her relationship with [the resource parent] was permanently ended." By contrast, Dr. Eig testified S.K.L. "would be at low risk for suffering severe and enduring harm if her relationship with [Mother] was to be

permanently severed." The trial court expressly credited those conclusions.

The trial court found Mother could not provide permanency. Dr. Eig found "the longer that permanency is delayed, the higher the risk of [S.K.L.] suffering severe and enduring harm." We recognize "the paramount need the children have for permanent and defined parent-child relationships." J.C., supra, 129 N.J. at 26. "A child cannot be held prisoner of the rights of others, even those of his or her parents. Children have their own rights, including the right to a permanent, safe and stable placement." N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div.), certif. denied, 180 N.J. 456 (2004). "Keeping the child in limbo, hoping for some long term unification plan, would be a misapplication of the law." A.G., supra, 344 N.J. Super. at 438. The court properly found sufficient evidence to satisfy the fourth prong.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0587-16T4