RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-3701-15T1

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

 Plaintiff-Respondent,

v.

N.S.,

 Defendant-Appellant,

and

M.S.,

 Defendant.
________________________________

IN THE MATTER OF THE GUARDIANSHIP
OF J.S. and A.S., MINORS.
________________________________

 Submitted March 27, 2017 – Decided March 31, 2017

 Before Judges Sabatino and Currier.

 On appeal from Superior Court of New Jersey,
 Chancery Division, Family Part, Cape May
 County, Docket No. FG-05-27-15.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Laura Orriols, Designated
 Counsel, on the brief).
 Christopher S. Porrino, Attorney General,
 attorney for respondent (Melissa H. Raksa,
 Assistant Attorney General, of counsel;
 Jennifer Russo-Belles, Deputy Attorney
 General, on the brief).

 Joseph E. Krakora, Public Defender, Law
 Guardian, attorney for minors (Aleli M.
 Crawford, Assistant Deputy Public Defender, on
 the brief).

PER CURIAM

 Defendant N.S. appeals the Family Part's April 18, 2016

judgment terminating her parental rights to her minor children,

J.S. ("Jason"), who is presently eight years old, and A.S.

("Allison"), who is presently six years old.1 For the reasons

that follow, we affirm.

 The children's biological father, M.S. ("Matthew"), is not a

party to the appeal because about three weeks before trial, he

made an identified surrender of his parental rights to his sisters

and their husbands, the children's paternal aunts and uncles, who

have been serving as the children's resource parents. More

specifically, Jason resides with, and is to be adopted by, his

paternal aunt J.P. and her husband D.P., while Allison resides

with, and is to be adopted by, her paternal aunt L.E. and her

husband D.E.

1
 We use initials and pseudonyms for the family members to protect
the privacy of the minors involved.

 2 A-3701-15T1
 On appeal, defendant argues that the Division of Child

Protection and Permanency ("the Division") did not prove prongs

one, two, or four of the statutory "best interests of the child"

test under N.J.S.A. 30:4C-15.1(a). She also argues that the judge

should have recused himself from the guardianship trial because

he formed a negative opinion about her while presiding over and

making findings in the earlier abuse and neglect proceedings.

 I.

 We derive the following facts from the record that bear upon

our consideration of the issues presented.

 The Division first became involved with this family on April

30, 2012, when it received an allegation of inadequate shelter and

environmental neglect. The referent alleged hoarding conditions

in defendant's home, as well as the presence of dead rodents in

the kitchen sink and around the home, with rodent poison scattered

on the floors "like chicken feed." The referent reported that the

home had a horrible smell, and there were electrical receptacles

hanging out of the walls. Finally, the referent raised concerns

about the parents' mental health and defendant's prescription drug

use.

 The Division investigated and found that the home was dirty,

cluttered, and messy. There were medication bottles on the floor

of the parents' upstairs bedroom, as well as missing outlet covers

 3 A-3701-15T1
in the hallway, and a missing light switch cover in the living

room, with wires protruding from the wall.

 Defendant denied that she was a hoarder. The Division's

investigation caseworker did not observe any rodents or rodent

poison in the home as alleged by the referent. However, defendant

admitted there had been a dead rat in the kitchen sink "a month

or two" earlier, which had since been thrown away. She also

admitted that the family members used rodent poison during the

winter months, but claimed they did so only in areas inaccessible

to the children, including the closet, the upstairs bathroom, and

behind the refrigerator in the kitchen. She stated that the poison

had been cleaned up.

 Defendant told the caseworker that she could not keep up with

housework because the kids constantly made messes, she suffered

from depression and an injured back, and she received no assistance

from Matthew or other family members. Nevertheless, both defendant

and Matthew separately assured the Division that they would clean

up the house and remediate any safety issues.

 Defendant stated that the home was owned by Matthew's parents,

and she and Matthew were responsible for paying only taxes,

insurance, and utilities. Defendant was not working outside the

home, while Matthew worked as a janitor, and the family received

government benefits, including food stamps.

 4 A-3701-15T1
 Defendant disclosed to the caseworker that she suffered from

depression, for which she took medication, and attended

counseling. She also disclosed that she had back surgery about a

year earlier, and she continued to take prescription medication

for pain. Matthew, meanwhile, admitted attending counseling for

anger management, taking medication for a chronic illness, and

occasionally smoking marijuana.

 Upon returning to the home on May 3, 2012, the Division

caseworker did not note any safety concerns. The home at that

point had been straightened up a bit, although the parents'

upstairs bedroom still needed work. The Division consequently

deemed the allegations of neglect at that time unfounded.

Nevertheless, the Division kept the case open for services, in

order to make sure the home remained clean and safe for the

children.

 Thereafter, defendants cooperated for a period of time with

the services provided and monitored by the Division. These

services included parenting skills and homemaking/life skills

services, psychological treatment and medication monitoring for

defendant, and anger management counseling for Matthew.

 At times, the parents seemed to be making progress on the

condition of the home, with the downstairs rooms appearing cleaner

and less cluttered. At other times, the downstairs rooms appeared

 5 A-3701-15T1
cluttered and dirty. Moreover, the upstairs rooms were regularly

in a messy condition, and defendants did not always permit

caseworkers to examine them.

 The observed conditions reflected more than inadequate

housekeeping. For example, at a visit on April 25, 2013, the

Division's caseworker noted concerns about the condition of the

children, remarking on their dirty clothing and their faces smeared

with dried food and mucus.

 At a later visit on May 31, 2013, a caseworker observed trash,

broken toys, and clothing strewn on the floor of Jason's bedroom,

as well as smeared feces on the bedroom wall. Responding to the

caseworker's statement that the wall needed to be cleaned

immediately, defendant stated that she had left the feces on the

wall because if Jason could smear his feces, then he could clean

them up as well.

 Jason was only four years old at the time. Moreover, as an

infant he was diagnosed with a genetic condition known as Cornelia

 6 A-3701-15T1
de Lange Syndrome ("CDLS"), which causes behavioral and

developmental problems,2 for which he receives services.3

 Several months later, on August 6, 2013, a caseworker observed

Allison put a magnet in her mouth and told defendant. Defendant

took the magnet away from the child and blamed Jason for the

incident, stating that Allison copies her brother's behaviors. At

the same visit, the caseworker again observed that Jason's bedroom

was a mess, with bags of trash, toys, broken wood, and Pediasure

bottles on the floor, and a potty chair was in the middle of the

room with urine and a bowel movement in it.

 Defendant did not accept responsibility for maintaining the

home. After more than a year of services, she continued to blame

her young children for making messes and not cleaning them up, and

to disclaim any personal obligation to clean, citing her physical

and mental limitations. She referred to the children as her "ball

and chain."

2
 CDLS, also known as de Lange syndrome, is "[a] congenital
disorder of infants marked by failure to grow, mental retardation,
a growing together of the eyebrows, a low hairline (down on the
forehead), a depressed bridge of the nose, low-set ears, short and
tapering fingers, and a small head. In some cases, the infant
[also] has congenitally large muscles. . . ." J.E. Schmidt, M.D.,
Attorneys' Dictionary of Medicine, D-15-16 (edition 2009).
3
 Matthew was diagnosed with CDLS several years after his son, in
2015.

 7 A-3701-15T1
 On September 19, 2013, more than sixteen months after the

initial referral, a Division caseworker and a service provider

conducted an unannounced visit to the home. No one responded to

their knocks on the door, and they observed Allison standing on a

dresser, banging on a first-floor window with an iPad.

 They contacted the police and after the officer arrived,

about thirty-five minutes after the workers' initial arrival,

defendant and Matthew finally opened the door. She said she could

not believe the worker had "called the f***ing police to come,"

and explained that she and Matthew had been upstairs sleeping

while Allison napped and Jason was at school, and with the doors

closed and the air conditioner on they had not heard any knocking.

She claimed she woke up when she heard Allison on the baby monitor.

 Defendant cursed at the workers and was belligerent during

this entire visit. On the first floor of the home, the workers

found broken and overturned furniture, as well as clothing, trash

bags, loose trash, half-eaten food, dirt, flies, screws,

construction tools, and dried dog food mixed with Cheerios strewn

on the floor. Defendant did not intervene to stop Allison from

picking through the dog food in order to eat the Cheerios, nor did

she intervene to stop her from picking up a baby spoon on the

windowsill, which was surrounded by mouse feces, so the workers

did so.

 8 A-3701-15T1
 As a result of these observations, the Division

administratively substantiated defendant and Matthew for

environmental neglect, substantial risk of physical injury, and

lack of supervision for Allison. Because Jason was not home, the

Division only substantiated environmental neglect and substantial

risk of physical injury. The Division removed the children on an

emergent basis under the Dodd Act.4 After the Division filed a

complaint for custody, the court approved the removal. Later, on

January 6, 2014, defendants stipulated to being a family in need

of services to ensure the health, safety, and welfare of their

children.

 Upon removal from their parents, the children were placed in

a resource home for one night, after which they were placed with

their paternal grandparents. They remained in that placement

until spring 2015, after the grandmother experienced health

issues. Thereafter, the children were placed separately, with

paternal aunts and uncles (Matthew's sisters and their husbands).

These relatives expressed a desire to adopt the children, and they

preferred adoption to kinship legal guardianship.

4
 A Dodd removal is an emergent removal of a minor without a court
order pursuant to N.J.S.A. 9:6-8.21 to -8.82 (the Dodd Act). N.J.
Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011).

 9 A-3701-15T1
 A Division caseworker testified at the guardianship trial

that, although the children are separated, the paternal family is

close-knit. The paternal aunts both teach in the same school,

they ensure that the children see each other at least three times

during the week, and their families often spend time together on

weekends. Moreover, the resource parents have engaged with the

Division to ensure that the children receive all necessary

services.

 After the September 2013 removal, the Division's goal

initially was family reunification. The areas of concern included

the state of the home, the parents' mental health, and the family's

financial stability, since defendant was not working and Matthew

worked only seasonally. They struggled to pay their bills.

 The Division continued to provide and monitor services,

including: family team meetings, parenting capacity evaluations

and a parenting program; psychiatric and psychological services

for both parents, including both individual and couples

counseling; and financial assistance, including furniture for the

home and money to pay the family's electric bill. Division records

also reflect that in the months after the removal, defendant sought

substance abuse treatment, but only counseling was recommended.

 During visits to the family home, caseworkers sometimes

remarked on certain improvements that defendants had made in

 10 A-3701-15T1
cleaning and decluttering. However, they also continued to note

serious problems, for example, an overwhelming odor of cat urine,

dirty carpets and mattresses, mold, and excessive clutter and

dangerous items left out in the open, both inside and outside the

home. Moreover, on some occasions, the parents resisted showing

the upstairs of the home.

 Due to continued problems at the home, the Division took the

extraordinary step of retaining a hoarding response company to

assist the parents in cleaning and decluttering the home and yard.

This occurred in May or June 2014, more than eight months after

the children's removal.

 Immediately after the hoarding company's intervention, the

home was substantially improved. 5 Over time, however, issues

returned.

 The Division provided visitation services to the parents

through the Robin's Nest agency, along with therapeutic and family

support services. Defendants regularly attended visitation, and

their interactions with the children were generally considered

positive.

 At first, the visitation was supervised. Over time, however,

it progressed to being only partially supervised, with some

5
 Division records reflect that defendant was briefly employed in
the summer of 2014. However, she lost the job in September 2014.

 11 A-3701-15T1
unsupervised time. In July 2014, the court granted an extension

of the plan for reunification. By September 2014, the children

were engaged in overnight weekend visits with their parents in the

hope of reunification in the near future.

 In October 2014, however, defendant suffered a mental health

crisis. When workers visited the home on October 3, 2014, at the

start of a weekend visit, defendant was disoriented, confused, and

slurring her words. She reported hallucinations, stating that she

had seen a dragon in the kitchen, and she could see things moving

on the walls, but it was "no big deal." She further stated that

she had been hiding knives around the home because she thought

someone was breaking in when she was alone.

 Matthew told the workers that defendant had been taking

incorrect doses of her medication, and she had been hallucinating

for months. He said he did not tell anyone about this earlier

because he did not want to delay reunification.

 Defendant was taken to the hospital, where she was evaluated

and then released. The weekend visit proceeded with Matthew only.

 When a caseworker visited four days later, on October 7,

2014, defendant admitted she had been having hallucinations off

and on since the children were removed. At the same visit, Matthew

cried and said he "was done"; he wanted defendant out of the home

 12 A-3701-15T1
because he did not want her problems to affect his chances of

getting the children back.

 About two weeks later, on October 23, Matthew reported that

defendant became violent when he asked her to leave the home, so

he called the police to remove her. When questioned by the

Division, defendant admitted throwing a bottle at Matthew, but

denied trying to choke him, as he had alleged. The following day

Matthew obtained a temporary restraining order against defendant,

and defendant began living with her sister.

 Thereafter, the Family Part granted additional extensions of

the plan for reunification, through April 2015. The Division had

continued concerns about defendant's mental stability, so its plan

was to seek reunification with Matthew only, first giving him some

time to manage life on his own and become financially stable.

 Robin's Nest provided services to both parents individually,

with defendant's visitation fully supervised due to safety

concerns. As time went on, Matthew was granted unsupervised

visitation with the children, and reunification with him appeared

likely.

 On March 24, 2015, however, with reunification planned for

the following month, Matthew advised the Division that he had

dismissed the restraining order against defendant, and they

planned to mend their relationship. Soon thereafter, the Division

 13 A-3701-15T1
learned that defendant had moved back into the marital home, and

she had been in the home during one of the children's visits with

Matthew, violating the requirement that her visits with the

children be supervised by a Division-approved individual.

 Given these changed circumstances, the Division delayed its

plan for reunification. It also reinstated supervised visitation

for both parents, due to concerns for the children's safety as a

result of defendant's mental health issues and the animosity

between the parents. Nevertheless, some visits occurred in the

home.

 The Division requested another extension of time for

reunification. However, by order dated April 15, 2015, the court

denied that request "because of continuing concerns and the lack

of sufficient progress[.]"

 In May 2015, the Family Part approved a permanency plan of

termination of parental rights followed by relative adoption. Then

in June, the Division filed a complaint for guardianship, and

terminated the abuse and neglect litigation.

 Thereafter, the couple's relationship remained unstable. In

August 2015, they reported they might divorce. However, the

following month, they reported they would remain a couple and

hoped to parent the children together. Defendant's mental health

 14 A-3701-15T1
also was uncertain, as she told her therapist in August 2015 that

she was having hallucinatory thoughts about a mechanical bug.

 Moreover, notwithstanding that supervised visits were allowed

at the home, the condition of the home remained problematic. On

visits conducted during this time period, the Division found the

downstairs area to be moderately clean, although it sometimes

smelled of garbage. However, even as late as December 2015, the

upstairs area was still partially under construction, as well as

dirty and unkempt. The outside of the home was problematic because

the porch was under construction, and the yard was overgrown and

full of trash, including construction materials, scrap metal, and

non-working vehicles.

 The testifying Division caseworker stated that reunification

was not possible at the time of trial due to both the condition

of the home, and defendant's failure to acknowledge the seriousness

of the condition, which raised concerns for the children's well-

being if they were returned to her care. The caseworker conceded,

however, that defendant was engaged in individual counseling, she

was employed, and her mental health had improved such that the

Division did not have any present concerns for her personal well-

being.

 The Division's expert psychologist, Dr. James Loving,

testified about his January 2016 psychological evaluation of

 15 A-3701-15T1
defendant, and his bonding evaluations between defendant and the

children, and of the children and their resource parents (with the

exception of Allison's uncle, who could not attend due to illness).

 Dr. Loving diagnosed defendant with major depressive disorder

that is recurrent and cyclical but in partial remission. He also

diagnosed her with an anxiety disorder, opioid use disorder in

sustained full remission, and dependent personality traits. He

credited her with complying with services and persistently working

to regain custody of her children.

 Nevertheless, Dr. Loving cited a number of factors that

rendered defendant unable to provide a safe, stable, and healthy

home to the children at present or within the foreseeable future,

including: her failure to consistently maintain a clean and safe

home; her failure to recognize her personal obligation to do so

as opposed to blaming others for the problems; and her failure to

recognize the risk of physical and emotional harm to the children

from conditions in the home. Dr. Loving also underscored the risk

that defendant's anxiety and debilitating depression would recur,

and that she would fail to seek treatment; the risk of recurrent

substance abuse; and her dependent personality traits, which

caused her to remain stuck in unhealthy situations and not function

independently.

 16 A-3701-15T1
 Dr. Loving testified that defendant's relationship with

Matthew posed "a double-edged sword" as relates to reunification.

On the one hand, Dr. Loving noted that the relationship was full

of conflict and characterized by mutual defiance and immaturity.

Thus, if the couple remained together, the children would be at

high risk from the household conditions and marital conflict,

which had not been fully remediated notwithstanding years of

services. Indeed, Dr. Loving believed it likely that the home

would devolve to much dirtier and unsafe conditions if

reunification occurred and the family were not closely monitored.

 On the other hand, Matthew had expressed to Dr. Loving an

intention to end his relationship with defendant, and, if the

couple separated, defendant would need to establish independent

living for the first time in years, with no plan for doing so, and

very few financial resources or sources of support. Reunification

under these circumstances, Dr. Loving opined, "would be a very

long-term plan at best." In the meantime, the children would be

kept "in a situation of limbo that would be unhealthy for them

over time." Moreover, Dr. Loving noted that the plan was risky

because termination of the marital relationship would cause

defendant severe stress, which in the past contributed to her

debilitating depression and anxiety.

 17 A-3701-15T1
 In terms of bonding, Dr. Loving found that the children had

strong, positive attachments to their parents and to each other,

as well as fairly strong and positive attachments to their resource

parents. Although Allison's uncle could not attend the bonding

session, Dr. Loving stated that "[t]here is every indication that

she experiences a similar attachment with" him as she does with

her aunt, noting that through her play Allison indicated she

perceived her uncle as part of her family.

 Dr. Loving acknowledged that if the children were permanently

separated from their parents, they would suffer at least temporary

confusion and be upset. Jason would be at greater risk than

Allison due to his age, the greater amount of time he spent in his

parents' care, and his disabilities. But Dr. Loving also predicted

if the children remained in their current homes and progressed

toward adoption, which would allow them a sense of permanency,

they would be capable of overcoming the loss of their parents and

they would not suffer severe or enduring harm.

 Ultimately, Dr. Loving supported the Division's plan for

termination of defendant's parental rights, followed by adoption

by the children's resource parents, because defendant was unable

to provide a safe, clean, stable, and healthy home to her children

at present or in the foreseeable future.

 18 A-3701-15T1
 In terms of defendant's future contact with the children, Dr.

Loving testified that both aunts had expressed the same sentiment,

that is, "ideally" defendant would remain involved. However, the

aunts were unsure what those arrangements would be given the

history of conflict between defendant and Matthew's family. In

terms of the children's continued relationship with each other,

the aunts told Dr. Loving that their families were very close, the

children saw each other on a regular basis, and they would continue

to facilitate frequent contact between them.

 The Law Guardian's expert psychologist, Dr. Jo Anne González,

also testified at trial. Dr. González performed a psychological

evaluation of defendant, as well as bonding evaluations of the

children and defendant, and of the children and their resource

parents. Allison's other resource parent, her paternal uncle, did

attend this evaluation. Her conclusions were largely the same as

Dr. Loving's.

 Dr. González's psychological examination revealed that

defendant is self-centered, needy, and manipulative; she resists

accepting responsibility for her actions; and she blames others

for the problems in her life. Moreover, her parenting assessment

revealed that defendant has serious deficits in her parenting

skills, rendering her unable to understand or meet her children's

needs.

 19 A-3701-15T1
 Dr. González diagnosed defendant with mood disorder, anxiety

disorder, personality disorder, and a history of opioid

dependence. She further concluded that defendant could not safely

parent her children due to her mental health issues. Dr. González

also noted defendant's failure to acknowledge responsibility for

her situation or her ability and obligation to remediate the

problems that led to the children's removal.

 In terms of bonding, Dr. González found that the children had

a strong and affectionate, yet insecure, attachment to defendant.

In particular, the Law Guardian's expert found that the children

were insecure about whether defendant could meet their needs; in

this regard, she noted that during the bonding examination the

children were hesitant to share information with their mother

about their current homes, for fear of upsetting her.

 Dr. González believed the children would suffer a sense of

loss if defendant's parental rights were terminated, with Jason

more affected than Allison since he was older and had been in

defendant's care for longer than his sister. However, the expert

concluded the termination would not cause the children irreparable

emotional damage. Rather, they would recover with guidance from

their resource parents, with whom they had strong and secure

attachments.

 20 A-3701-15T1
 By contrast, Dr. González found that if the children were

placed with defendant they would suffer from the loss of their

relationships with their resource parents and resource siblings

(cousins),6 which defendant would not be able to remediate because

she would neither understand nor be sensitive to the children's

sense of loss. Moreover, Dr. González testified that if the

children were returned to defendant they would face a significant

risk of neglect, and defendant would have particular difficulty

dealing with Jason, who is more challenging due to his disabilities

and special needs.

 Finally, Dr. González perceived no benefit in granting

defendant additional time to eliminate the risks she posed to the

children, because the children needed permanency. In this regard,

she estimated that if defendant's plan were to parent the children

on her own, it would take between eighteen months and two years

for her to establish her ability to do so. Thus, Dr. González

recommended that defendant's parental rights be terminated due to

defendant's inability to provide safe and adequate parenting, and

the children be adopted by their resource parents.

 Commenting on defendant's ability to see the children in the

future after a termination, Dr. González testified that the aunts

6
 Allison's resource sibling participated in the bonding
evaluation.

 21 A-3701-15T1
told her "they're not closing the door on having contact with

[defendant], but they want other things to change before" that

happens. At the same time, Dr. González did not recommend family

counseling due to the level of animosity and distrust between

defendant and Matthew's family members.

 Defendant did not testify at trial, nor did she present any

fact or expert witnesses.

 II.

 A.

 Turning to the issues raised on appeal, we note the law in

this area is well-established. "Parents have a constitutional

right to raise their children. . . . But that right is not

absolute. It is a right tempered by the State's parens patriae

responsibility to protect children whose vulnerable lives or

psychological well-being may have been harmed or may be seriously

endangered by a neglectful or abusive parent." N.J. Div. of Youth

& Family Servs. v. F.M., 211 N.J. 420, 447 (2012).

 Under N.J.S.A. 30:4C-15.1(a):

 The division shall initiate a petition to
 terminate parental rights on the grounds of
 the "best interests of the child" . . . if the
 following standards are met:

 (1) The child's safety, health, or
 development has been or will continue to be
 endangered by the parental relationship;

 22 A-3701-15T1
 (2) The parent is unwilling or unable
 to eliminate the harm facing the child or is
 unable or unwilling to provide a safe and
 stable home for the child and the delay of
 permanent placement will add to the harm.
 Such harm may include evidence that separating
 the child from his resource family parents
 would cause serious and enduring emotional or
 psychological harm to the child;

 (3) The division has made reasonable
 efforts to provide services to help the parent
 correct the circumstances which led to the
 child's placement outside the home and the
 court has considered alternatives to
 termination of parental rights; and

 (4) Termination of parental rights will
 not do more harm than good.

 The Division must prove all four prongs of the statutory

standard, which are interrelated, by clear and convincing

evidence. F.M., supra, 211 N.J. at 447-48.

 On appeal from a termination of parental rights, we must

recognize the Family Part's "specialized knowledge and experience

in matters involving parental relationships and the best interests

of children." Id. at 427. Thus, "[w]e defer to the family court's

findings unless they are so wide of the mark that our intervention

is required to avert an injustice. So long as the record contains

substantial and credible evidence to support the family court's

decision, we may not second-guess its judgment." Ibid. See also

N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552-53

(2014); N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261,

 23 A-3701-15T1
278-79 (2007). We also "defer to the trial court's credibility

determinations." R.G., supra, 217 N.J. at 552.

 B.

 Here, the trial court specifically found the witnesses

presented by the Division and the Law Guardian to be credible, and

found Dr. González's testimony particularly compelling. The court

noted that all of the evidence was unrebutted.

 Regarding the first prong of the Title Thirty statutory test

for termination, the court found that the children's safety and

welfare would continue to be endangered by the parental

relationship, since defendant was unable or unwilling to provide

a safe and clean home for her children. The court pointedly stated

in this regard:

 Much of the theme and history of this case has
 to do with [defendant] and her deflection of
 responsibility for the conditions in the home
 that led to the removal. She'd blame her
 husband for the conditions of the home; she'd
 blame third parties; she even blamed the
 children for the conditions of the home. At
 one point [Jason's] feces was observed to be
 smeared against the wall. The Division
 inquired . . . why it hadn't been cleaned up.
 [Defendant] indicated that it was [Jason's]
 responsibility to clean it up because he put
 it there. This fundamental lack of insight
 and acceptance of responsibility has not
 changed during the four years the Division has
 been involved with this family and it's not
 going to change.

 24 A-3701-15T1
 Regarding the second prong of the statute, the court found

that defendant was unwilling or unable to eliminate the harm,

incorporating its prior analysis and noting the "multitude of

services" provided by the Division. Even defendant "herself

reported that the home wasn't acceptable for the children to return

to." The court cited Dr. González's testimony for its conclusion

that defendant "lacks the insight necessary to make the changes

to allow her to provide a safe home for the children and that's

not going to change[.]" Finally, the court relied upon the expert

testimony to conclude that delaying the matter would be harmful

to the children, who were entitled to permanency. As the court

observed: "[f]our years is enough."

 Regarding the third prong, the court cited the many services

provided by the Division, and concluded that they constituted

"more than reasonable efforts." Moreover, the court found there

was no alternative to termination of parental rights because the

children were in safe and loving resource homes, and their resource

parents wanted to adopt and were not interested in kinship legal

guardianship.

 Finally, regarding the fourth prong, the court concluded that

termination of defendant's parental rights would not do more harm

than good because the children were in safe homes with resource

parents committed to adoption, and defendant was not in a position

 25 A-3701-15T1
to safely parent her children, nor would she be "within an

acceptable or reasonable time frame that it makes a difference for

these kids." In this regard, the court noted that defendant had

no plan for her own future, let alone the children. The court

acknowledged that the children would suffer a loss if defendant's

rights were terminated, but concluded that the loss was

"significantly outweighed by the possibility of adoption by a safe

and loving home which can provide the safe environment [defendant]

cannot."

 C.

 Defendant disputes the court's findings with respect to

prongs one and two of the statutory test. She argues that, since

at least June 2014, the house did not present a safety concern for

the children, as evidenced by the fact that visitation was allowed

in the home.

 Defendant acknowledges that, during this time frame, the home

and yard were cluttered. However, particularly with respect to

the downstairs of the home, the Division allegedly noted only

"housekeeping" concerns, not safety concerns, and as a matter of

law "a messy house" that does not endanger the safety, health, or

development of the children is insufficient to prove the first or

second prongs of the statutory test.

 26 A-3701-15T1
 Defendant maintains that the court erred by relying heavily

upon the condition of the home at the beginning of the Division's

involvement, as opposed to the time of trial. Further, she argues

that the second floor of the home is irrelevant to the court's

consideration because the children could be excluded from that

portion of the home.

 Also with respect to the first and second prongs of the

statutory test, defendant argues that the court erred by concluding

she lacked insight and personal accountability to improve the

conditions of the home. In this regard, she notes her voluntary

enrollment in therapy to manage her depression and anxiety, her

compliance with services, and notations by service providers

indicating that she had shown progress and improvement in her

acceptance of responsibility.

 Defendant further argues that the experts who concluded she

lacked insight relied upon "imperfect information and a

misunderstanding of the underlying facts," particularly because

they never visited the home and instead relied upon the

caseworkers' assessments. She claims their opinions that she

would not continue to improve were inconsistent with the

observations of her treatment providers. Moreover, she claims the

court erred by crediting the experts merely because she did not

present any expert testimony of her own.

 27 A-3701-15T1
 Having carefully considered these arguments by defendant, we

find no error in the court's conclusions as to prongs one and two

of the statutory test. The record amply supports the trial court's

conclusion that defendant endangered the welfare of her children

through the condition of her home, she was unable or unwilling to

eliminate the harm facing the children or provide a safe and stable

home, and the delay of permanent placement would add to the harm.

 "The first two elements of the best interests of the child

standard relate to the finding of harm arising out of the parental

relationship." In re Guardianship of D.M.H., 161 N.J. 365, 378

(1999). Thus, "evidence that supports one informs and may support

the other as part of the comprehensive basis for determining the

best interests of the child." Id. at 379.

 Turning to defendant's specific arguments, we first disagree

with her contention that the court erred by addressing the early

conditions of the home. These conditions were relevant to the

prong one analysis and the harm caused to the children. We note,

however, that the court did not limit its analysis to the

Division's initial involvement with the family. It also addressed

evidence of current conditions at the home, including defendant's

admission to Dr. González that the home was not currently

appropriate for the children to be returned.

 28 A-3701-15T1
 Moreover, contrary to defendant's argument, the record in

this case does not reflect merely inadequate housekeeping. As a

result of defendant's incapacitating depression and anxiety, her

immature and conflicted relationship with Matthew, and her failure

to recognize the needs of her children, conditions at the home

have regularly presented concerns for the children's safety should

they be returned to defendant's care.

 Specifically, the evidence shows that at various times in

2012 and 2013, the home was routinely dirty and cluttered, both

upstairs and downstairs, and ultimately the children were removed

due to the deplorable and unsafe conditions found on September 19,

2013. After the hoarding company's intervention in June 2014,

conditions at the home appeared to have improved such that Division

intended to reunify the family. Just four months later, however,

in October, the Division learned that defendant had been concealing

the deteriorating status of her mental health, including

hallucinations that convinced her to hide knives around the home,

which presented a danger to the children.

 Thereafter, between October 2014 and March 2015, defendant

was out of the home. While in-home visitation was reinstated for

Matthew, the condition of the home at this time was unrelated to

defendant.

 29 A-3701-15T1
 After defendant's March 2015 return to the home, visitation

was supervised, sometimes in the home, and the Division found the

downstairs to be adequately clean. However, the caseworker

testified that the upstairs still remained dirty and unkempt, as

well as partly under construction, the porch was under

construction, and the yard was overgrown and full of materials

that posed a danger to the children. In the caseworker's opinion,

the current condition of the home precluded family reunification,

and Dr. González testified that defendant admitted as much during

her December 2015 examination.

 Taken as a whole, this record manifestly supports the court's

conclusions as to defendant's endangering the safety and welfare

of her children, and her inability and unwillingness to maintain

a safe and stable home. See, e.g., N.J. Div. of Youth & Family

Servs. v. K.M., 136 N.J. 546, 550-53, 562 (1994) (affirming finding

of abuse and neglect based, in part, upon dangerous and filthy

living conditions in the home). Moreover, we disagree with

defendant's argument that the condition of the yard and the

upstairs of the home are irrelevant to the court's consideration.

The record reflects that the home is accessed through the front

yard, and the children play in the yard. Therefore, the presence

of dangerous items in the yard is relevant to the overall safety

of the home.

 30 A-3701-15T1
 We further note that the second floor of the home is not

unused space from which the children can be excluded. It contains

living space that is currently being used by the family, including

the parents' bedroom. This is an area of the home the children

should be able to safely access, especially given the parents'

history of leaving the children unattended downstairs during

waking hours, while the parents are upstairs.

 Contrary to defendant's argument, we find no error in the

court's conclusions regarding her lack of insight and her failure

to take personal accountability to improve the conditions of the

home. The evidence sufficiently shows that defendant lacked

insight into her children's developmental needs and abilities, and

her own obligations as a parent. She excused the condition of the

home by pointing to her mental and physical condition, or she

blamed her husband for failing to maintain the home. Most

disturbingly, she at times blamed the children for creating messes

and not cleaning them up, failing to take into account their young

ages and their developmental abilities.

 The experts and the trial court did acknowledge defendant's

engagement with services provided by the Division, as do we.

Unfortunately, however, notwithstanding years of services, her

efforts have not produced significant results in improving the

factors that led to the children's removal. Indeed, when examined

 31 A-3701-15T1
by Dr. González in December 2015, defendant effectively failed the

parenting assessment, indicating that she continued to have little

insight into her children's developmental needs or how to fulfill

them.

 In this regard, the court reasonably relied upon the testimony

of both Dr. Loving and Dr. González that defendant is presently

incapable of safely parenting her children, and she will remain

so for the foreseeable future. The court also reasonably relied

upon the experts' opinions that the children required permanence,

and that a delay to allow defendant further time to prove herself

would merely add to the harm already suffered.

 Finally, regarding the court's credibility assessments, we

agree with defendant that the court was not bound to accept the

testimonial evidence as true simply because defendant presented

no witnesses. Considering the opinion as a whole, it is clear the

court accepted the witnesses' testimony because it was credible

and supported by the documentary record, as well as the experts'

examinations of defendant.

 Furthermore, contrary to defendant's suggestion, the experts'

opinions are not invalid or less valuable because they did not

visit the home. To the contrary, the caseworkers' observations

are the best evidence as to the condition of the home over the

course of the Division's involvement. A single visit by the

 32 A-3701-15T1
experts would be of little value. Thus, we perceive no error in

the court's credibility determinations.

 We likewise reject defendant's argument that the court erred

in finding the Division had proven the fourth prong of the

statutory test. This element is addressed to whether the

termination of parental rights will do more harm than good.

N.J.S.A. 304C-15.1(a)(4). The fourth prong "is related to the

first and second elements of the best interests standard, which

also focus on parental harm to the children." D.M.H., supra, 161

N.J. at 384. It "serves as a fail-safe against termination even

where the remaining standards have been met." N.J. Div. of Youth

& Family Servs. v. G.L., 191 N.J. 596, 609 (2007).

 The fourth prong does not require "a showing that no harm

will befall the child as a result of the severing of biological

ties." In re Guardianship of K.H.O., 161 N.J. 337, 355 (1999).

Rather, the question to be addressed is whether, after considering

and balancing the children's relationships, the children will

suffer a greater harm from the termination of the ties with their

mother than from the permanent disruption of their relationships

with their resource parents. Ibid. Accord M.M., supra, 189 N.J.

at 281 (noting that expert testimony on bonding should be submitted

by the Division). The question is not which set of parents can

provide a "better" home for the child, but what is in the child's

 33 A-3701-15T1
best interests. N.J. Div. of Youth & Family Servs. v. A.W., 103

N.J. 591, 603 (1986).

 In making an assessment under prong four, courts must be

cognizant of the State's "strong public policy in favor of

permanency," and they "must not lose sight of time from the

perspective of the child's needs." K.H.O., supra, 161 N.J. at

357. Accord R.G., supra, 217 N.J. at 559. They must consider the

children's ages, their overall health and development, and "the

realistic likelihood that [defendant] will be capable of caring

for the child[ren] in the near future." K.H.O., supra, 161 N.J.

at 357.

 We first address defendant's arguments questioning the

validity of the experts' bonding assessments of Allison and her

resource parents, and the court's reliance upon the experts'

conclusions. Specifically, defendant faults Dr. Loving for going

forward with the bonding evaluation of Allison and her resource

parents without the presence of the uncle, and simply assuming the

results would apply to him as well. She also faults Dr. González

for allowing Allison's cousin to participate in the bonding

evaluation, because this changed the dynamic and the ability of

Dr. González to assess the bond between Allison and her resource

parents.

 34 A-3701-15T1
 We perceive no basis for reversal based upon these arguments.

We agree that Dr. Loving's assessment about Allison's bond with

her resource father was impeded by the latter's non-participation

in the bonding evaluation. Townsend v. Pierre, 221 N.J. 36, 53-

55 (2015) (addressing the net opinion rule). However, his

conclusion that Allison was bonded with her resource mother was

supported independently by factual evidence and appropriately

considered by the court. Moreover, the court had the benefit of

Dr. González's credible separate professional opinion that Allison

was bonded with both of her resource parents. Hence, the court

did not err in concluding she was bonded with her uncle as well

as her aunt.

 We also find no error in the court's reliance upon Dr.

González's bonding assessment of Allison and her resource parents

because their biological daughter participated in the session.

The trial judge heard competing views as to whether it is

appropriate to conduct a bonding evaluation with an entire family,

or just the parents and the child at issue. Dr. Loving testified

that he generally does not include other family members, but he

admitted there were both "pros and cons" to including them. On

the other hand, Dr. González testified that her preference was to

include all who live in the household; and in this particular

case, Dr. González wanted the cousin to be present because Allison

 35 A-3701-15T1
had a close relationship with her, and Allison had expressed fear

of the assessment.

 In sum, the court was able to assess defendant's critique of

Dr. González's methodology, and we have no basis for rejecting the

court's acceptance of her conclusions. A trier of fact, in this

instance the Family Part judge, is free to accept or reject the

opinions of any testifying expert, in full or in part. See, e.g.,

Becker v. Baron Bros., 138 N.J. 145, 159, 164-65 (1994); Angel v.

Rand Express Lines, Inc., 66 N.J. Super. 77, 85-86 (App. Div.

1961).

 Defendant faults both experts for allegedly ignoring concerns

about the commitment of both sets of resource parents to the

children, and the level of care they provide. We find no merit

to this argument. The experts' reports indicate they considered

the Division records, which included factual accounts of the

caseworkers' interactions with the resource parents. See N.J.R.E.

703 (authorizing experts to consider written materials and other

factual evidence not provided in admissible testimony). Moreover,

the experts met with the resource parents, except as previously

discussed, and were able to assess their level of commitment to

the children. There is no indication that the children are

mistreated in their resource homes, nor any reason to question the

resource parents' commitments to adopt.

 36 A-3701-15T1
 Next, defendant faults both experts for failing to adequately

address the separation of the children, arguing that the "glaring

absence of sibling evaluation data renders all the bonding

evaluations deficient as a matter of law because the opinions fail

to consider the harm that would be visited upon the children by

remaining in separate homes."

 We disagree. Defendant cites no legal authority requiring a

bonding evaluation between the siblings. There is a preference

for siblings to be placed together, N.J.S.A. 9:6B-4(d), but this

is not always possible. In this case, the Division initially

placed the children together in the home of their paternal

grandparents, but that placement became untenable when the

paternal grandmother became ill. Only at that point, in spring

2015, were the children placed separately with their paternal

aunts. Although separated, the children as of the time of trial

maintained close ties. The aunts ensured that the children saw

each other during the week and often on weekends as well. The

experts rightly considered these facts in recommending the

termination of parental rights, and the court agreed with their

recommendations.

 Finally, defendant emphasizes her strong bond with the

children, which was undisputed, and the caseworker's testimony

that she was employed at the time of trial and the Division had

 37 A-3701-15T1
no present concerns for her well-being. Based upon these factors,

she argues that there was no reason to believe she would be unable

to care for the children independently. She argues that she should

be given an opportunity to establish herself as a single parent

prior to a termination of her parental rights, and that concerns

over possible future instability "cannot reasonably be held to

significantly outweigh the harm that will stem from termination."

 We disagree with defendant's assessment of the record. The

sincerity of her love for her children, or them for her, is not

doubted. Both experts found that the children had strong, positive

attachments with their parents, and the visitation reports support

that opinion. However, Dr. González also opined, without

contradiction, that the children's attachment to defendant was

insecure. Neither expert believed defendant was presently capable

of caring for them.

 Thus, to the extent defendant wished to parent the children

on her own, the record is bereft of evidence that it could happen

immediately, as she argues on appeal. Dr. Loving testified that

reunification under such circumstances "would be a very long-term

plan, at best," and Dr. González similarly opined that it could

take up to two years for defendant to prove her ability to care

for the children on her own. Neither expert believed this plan

would be in the children's best interests, because the children

 38 A-3701-15T1
had been placed outside the home for so long, and they required

permanency. The trial court credited these experts' opinions, and

we have no basis for rejecting that credibility assessment. The

court appropriately gave much weight to the children's vital needs

for permanency. R.G., supra, 217 N.J. at 559.

 D.

 In her final argument, defendant maintains that the judge

should have recused himself from the guardianship trial because

he had overseen the case since its inception as an abuse and

neglect proceeding, and because he denied the Division's April

2015 request for an extension of time for reunification. She

contends that the judge was "frustrated" with her, and he had

already formed an opinion about her that prevented him from

engaging in a fair analysis of the record. In this regard, she

notes the judge's reliance upon "stale data" and his conclusion

that there was a pattern of regression in the home conditions,

when in reality the home had remained safe for an extended period

of time.

 There is no requirement that guardianship proceedings be

heard by a different judge than the one who presided over the

abuse and neglect proceedings. N.J. Div. of Youth & Family Servs.

v. L.C., 346 N.J. Super. 435, 438-40 (App. Div. 2002). To the

contrary, there are policy justifications and efficiencies for

 39 A-3701-15T1
generally having the same Family Part judge hear both matters.

Id. at 439.

 In addition, "judges are constantly required to adjudicate

matters involving parties and related disputes which have come

before the judge in a different proceeding." Id. at 440. They

"are perfectly capable of recognizing the different issues

involved, different standards of proof required and different

remedies sought without 'prejudging' a defendant so as to implicate

due process concerns." Ibid. "Ultimately, the judge, on

appropriate application from a litigant, must consider whether her

involvement in a case warrants that judge recusing herself from

further consideration of the issues." Ibid.

 Here, defendant never moved for recusal under Rule 1:12-2.

Moreover, we discern no evidence of improper bias in the judge's

handling of the case. His denial of the Division's April 2015

request for an extension of time for reunification was not

unreasonable, as the children had been in resource homes for more

than eighteen months. Nor does that denial constitute evidence

that he had unfairly pre-judged the guardianship proceedings.

 As clearly set forth in the court's oral opinion, the judge

appropriately reached his guardianship conclusions based upon a

reasonable assessment of the entirety of the trial record. We

find no basis to set aside his careful judgment of this case.

 40 A-3701-15T1
Affirmed.

 41 A-3701-15T1