# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4769-18T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

 Plaintiff-Respondent,

v.

P.M.,

 Defendant,

and

M.M.,

 Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF K.M.
and J.M.,

 Minors.

_____

Submitted March 16, 2020 – Decided May 5, 2020

Before Judges Messano and Ostrer.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Cumberland County, Docket No. FG-06-0028-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Louis W. Skinner, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Amy Melissa Young, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Linda Vele Alexander, Designated Counsel, on the brief).

PER CURIAM

Defendant M.M. (Matthew[1]) appeals from the Family Part's June 14, 2019 judgment terminating his parental rights to his sons K.M. (Karl), born December 2013, and J.M. (Jason), born March 2015. Before trial, the children's mother and Matthew's ex-wife, P.M. (Patricia), entered an identified surrender of her parental rights, provided that one or both the current resource parents adopt the two boys.

---

[1] In accord with Rule 1:38-3 and the for the reader's convenience, we use initials and pseudonyms for the parties.

Matthew challenges the court's findings on all four prongs of the best interests standard. N.J.S.A. 30:4C-15.1(a). The Law Guardian for the two boys joins the Division of Child Protection and Permanency (Division) in opposing the appeal. Having reviewed the record in light of Matthew's arguments, we conclude that the trial court correctly applied the governing legal principles, and sufficient credible evidence supports its finding that the Division satisfied the best interests standard. Therefore, we affirm.

I.

The Division presented its case through the testimony of a Division family service specialist who had reviewed pertinent Division records, and a psychological expert, Linda Jeffrey, Ph.D., who evaluated Matthew, and performed bonding evaluations of the children with Matthew and the foster parents. The court also admitted into evidence voluminous Division records, subject to a limitation regarding embedded inadmissible hearsay.[2] Matthew and his sister testified in his defense. We discern the following from that evidence.

At the time of trial, the children had been in foster care for over three years, interrupted by increasingly shorter periods of reunification with their

---

[2] Although the defense objected to embedded hearsay in the documents, the defense raised no objection to hearsay offered by the Division's witnesses.

mother. Four times, the children were removed from their home, which was disrupted by domestic violence. The first removal occurred in July 2015. Matthew had not cared for the children since then. His visitation during their removal was inconsistent, and there were lengthy periods when he did not see the children, either because he had not complied with services, his whereabouts were unknown, or he did not appear. He conceded at trial that he was not ready to serve as a full-time parent and provide them permanency.

The Division first became involved with the family a year before the removal. Twice in an eight-month period, Patricia alleged that Matthew committed physical acts of domestic violence. She alleged he shoved her while she was holding Karl. Patricia obtained a restraining order, but then dismissed it. In a later incident, he allegedly punched, choked, and threatened to kill her. Patricia declined to stay in a safe house; and both parents refused in-home parenting services and counseling.

The first removal occurred after Patricia brought Karl to the hospital with blisters on his legs. She told the physician that Matthew pulled her hair, and forced her to have sex with him. Neither parent could identify an appropriate person to assist in implementing a safety protection plan and supervising the children's care.

During the Division's involvement with the family, Patricia obtained, then dropped six temporary restraining orders (TROs). She alleged Matthew forced her to drop the orders. One time, he was arrested while waiting in her car at the courthouse. Ultimately, she obtained a final restraining order against Matthew.

The family was offered numerous services, including domestic violence, anger management, substance abuse treatment, family reunification, and psychological and psychiatric evaluations. Matthew started a program for stress and coping management but was discharged after three months for nonattendance. He repeatedly tested positive for cocaine, and alcohol, as well. Although he attended some substance abuse and psychological evaluations, he did not complete treatment. He only completed a parenting and a batterer's intervention program.

The initial removal lasted eleven months. Matthew was afforded weekly visits for most of that time, except for a three-month period when his whereabouts became unknown. The children were returned to Patricia, but not Matthew, as the Division remained concerned about domestic violence in the home. A couple days later, the Division received news that Matthew had violated a TRO.

5

In July 2016, the Division removed the children again, after Patricia had informed the agency "she was feeling overwhelmed caring for her children and the stressors of her husband." Patricia had reported she had bipolar disorder. There was a warrant for Matthew's arrest for violating a TRO. The children were placed with the same resource parents who cared for them previously.

After Patricia resumed psychiatric medication, the children were returned to her, while the Division retained care and custody. Matthew was ordered to cease contact with Patricia and the children. But he continued to reach out to Patricia and even showed up outside her apartment and art class.

A babysitter's report that Patricia threatened to kill the children prompted the third removal, in December 2016. Patricia could not demonstrate she was taking her medication. Patricia was ordered to attend a psychological evaluation. Again, the children were not placed with Matthew due to concerns about domestic violence and substance abuse. Matthew was ordered to attend psychiatric and substance abuse evaluations, and cease contact with Patricia and the children.

The children, then three and a year-and-a-half, returned to the previous resource parents for eighteen months. The court ordered that visitations between

6

Matthew and the children could resume if he complied with the Division's services, but he did not.

A psychiatric evaluation found that Matthew presented with "a conglomerate of different psychiatric problems and different psychiatric diagnoses intermingled and interwoven with each other, sitting on the foundation of him having a number of maladaptive personality traits." The evaluator recommended psychotherapeutic treatment, cognitive behavioral therapy, parenting classes, a parental fitness evaluation, random drug screens, and anger management. Matthew was twice terminated from substance abuse programs. One lab result showed a faint level of cocaine. Another one showed a diluted urine sample.

In June 2018, the children reunited with Patricia. Matthew was not granted joint custody because of ongoing concerns about domestic violence. But he was allowed weekly supervised visits with the children. He was also ordered to attend batterer's counseling, intensive anger management, cognitive behavioral therapy, and psychiatric and substance abuse evaluations.

Three months later, the Division removed the children for the last time, and returned them to the resource family where they had previously resided. Patricia had brought the children to Matthew's sister's house where they stayed

7

overnight. Matthew also stayed at his sister's house. When Patricia returned to retrieve the children, Matthew had the children and resisted Patricia taking them. The Division removed the children because she allowed them to go where she knew Matthew could visit.

After that removal, the Division again offered Matthew cognitive behavioral therapy and anger management services, but he only attended one appointment. He tested positive for cocaine, but refused to attend a recommended residential treatment program. He was offered visitation services, and psychological and bonding evaluations. Visits with the children were permitted at the Division's offices through December 2018. Aside from his failure to complete services, the Division noted that Matthew lacked an appropriate home for the children. At the time of trial, Matthew lived with his sister, who had previous involvement with the Division and was ruled out as a possible placement. The Division ruled out other persons, including a former wife of Matthew, who stated in 2015 that she was unwilling to care for the children.

The Division's family specialist testified that the Division had continuing concerns about Matthew's substance abuse, domestic violence, mental health, and parenting ability. Since the children's initial removal, Matthew had never

cared for them full-time. He only had supervised visitations with them. The children were doing well with the resource parents, who wished to adopt them.

Based on the evaluations she performed in early 2019, Dr. Jeffrey testified that Matthew demonstrated a lack of candor during testing, and his testing indicated he was "faking good." He reported he had been incarcerated eight to ten times, but could not recall his convictions. He said he last used drugs in the 1990s, yet admitted he tested positive for cocaine the previous January. He denied committing acts of domestic violence, although there was a final restraining order against him. He also disclosed that he was taking medication for depression; he had bipolar disorder; and had experienced hallucinations. He reported that he was jobless for eight years and received Supplemental Security Income.

Dr. Jeffrey opined that Matthew had poor insight and judgment. He had personality disorders with "narcissistic, borderline and antisocial personality features." She said Matthew had unresolved mental health problems which would interfere or likely decrease his parenting capacity. She opined that he was "not prepared to provide a minimal level of safe parenting." She also cited Matthew's inability to find employment and provide independent housing for the children. Dr. Jeffrey concluded that placing the children in Matthew's care

would risk harm to them. Dr. Jeffrey also testified that the multiple placements were a "very negative thing" and the children were "lucky that they have had the same conscientious resource parents."

Dr. Jeffrey opined the children displayed "insecure attachments" to Matthew. Although Matthew was attentive and affectionate with the children, and they displayed affectionate ties to him, "they were not using him as their major sources of security . . . [or] parental authority." She noted that the children were in and out of placement for years and learned to rely on other people for care and security. Dr. Jeffrey did not recommend placing the children with Matthew.

By contrast, Dr. Jeffrey opined that the children had a "secure attachment" with their resource parents, and severing that attachment would be "a very serious blow" to the children. Dr. Jeffrey recommended that the children remain in the resource parents' care.

Matthew's sister testified that Matthew had been living with her since 2015. She alleged that Patricia often visited Matthew at her house with the children. She testified that Patricia told her the restraining order was no longer in effect. However, the day following one visit in April 2019, police arrested Matthew.

10

Matthew was released by the time he testified at the guardianship trial. He said he had been in jail for roughly seventy-seven days for violating the restraining order. He admitted violating TROs five or six times. He said Patricia often gave him hope that they could work things out. Matthew also admitted he was convicted of domestic violence in 2017, and completed a batterer's program after that.[3] He denied any subsequent domestic violence, although Patricia alleged it. He noted that he had three children with his first wife, with whom he was together for thirteen years. He said she and he "had a foster care business

---

[3] His admission apparently took his attorney by surprise. After a line of questioning evidently intended to establish that he violated TROs with Patricia's complicity, Matthew engaged in the following question and answer:

Q. Did you – were ever charged with or convicted of domestic violence?

A. Yes

Q. You were?

A. Yes.

Q. And when was that?

A. That was here in Bridgeton. I don't know exactly – exactly what day.

Q. Was it last year, the year before?

A. I believe it was in 2017, I believe.

A-4769-18T1

together," and he was "qualified to be in the home with the kids if she wasn't there."

Matthew testified that he last used drugs in March 2019. He said he was unable to fully engage and complete treatment because of his recent incarceration. He admitted he was discharged from a combined mental health and substance abuse program because of non-attendance. He stated he had just started a new intensive outpatient drug program the previous week.

He lamented that Patricia had a greater opportunity than he did to raise the children, while conceding his own challenges.

> I just felt that, you know, she was given the opportunity three different times and I never got a chance to have an opportunity to, you know, really bond with my kids . . . . I know my mental and substance and everything is a contributing factor and everything, and sometime, you know, you could fall down, but I try to get back up. And that's one of the reasons why I'm still here. I mean, I could have signed my rights away and all that stuff, but it will haunt me for the rest of my life that I didn't at least try.

He stated that his children should be returned to him "once I get all my services and everything and I get myself on my feet." He asked that they be placed with his aunt and uncle, although a background investigation was still underway. He refused to concede that he would not be ready to parent for a

couple years, but he admitted he needed more time as he had "a lot of stuff on [his] plate," and his children were in a "good spot" where they were placed.

In an oral decision, the court terminated Matthew's parental rights. The court found all the witnesses credible, noting Matthew's candor that he was not presently prepared to parent the children.[4] The court found that the Division proved by clear and convincing evidence all four prongs of the best interests standard. The court determined that Matthew's "significant psychological, psychiatric challenges, [and] substance use challenges," as well as at least one established incident of domestic violence, had endangered the children's health, safety, and development.

Second, the court found that Matthew was unwilling and unable to provide a stable home for the children within a reasonable period, because he was facing "too many challenges," and delaying a permanent placement would add to the harm to the children. The court noted Matthew's unsuccessful discharge from treatment. His failure to obey TROs and his subsequent incarceration interfered

---

[4] The court noted that, notwithstanding the reference at trial to numerous TROs, the Division failed to present certified judgments of conviction or other competent proof that Matthew committed the numerous acts of domestic violence alleged. The court noted only the undisputed fact that one FRO was entered. The court also misstated that there was no evidence that Matthew "has been found guilty of committing an act of domestic violence in the criminal sense," as he admitted he was convicted in 2017.

A-4769-18T1

with his ability to complete services. The court highlighted Matthew's admission he had "a lot on [his] plate" given his substance abuse and mental health issues. The court found that "separating the child[ren] from their resource family would cause serious and enduring emotional or psychological harm."

Third, the court found that the Division provided reasonable services to Matthew, noting: psychological and psychiatric "interventions," including cognitive behavior therapy, and anger management or batterer's programs; substance abuse services; and visitation and in-house parenting programs. The court also found that the Division made an appropriate, albeit unsuccessful effort, to place the children with an acceptable relative.

Finally, the court found that termination would not do more harm than good. The court noted that the children have a secure, healthy attachment to their resource parents, and severing that bond "would cause long-term, future, significant risks" of harm. On the other hand, the children had only an "insecure attachment" with their father; Matthew was "not in a position . . . to provide the minimal level of safe parenting"; and delaying permanency would cause the children "more harm than any other action at this point."

II.

We exercise limited review of the trial court's decision. In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002). We defer to the trial court's fact-finding because of its "special expertise" in family matters and its "superior ability to gauge the credibility of the witnesses who testify before it[.]" N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012). "We will not disturb the family court's decision to terminate parental rights when there is substantial credible evidence in the record to support the court's findings." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008).

In reviewing the legal issues de novo, see Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995), we must determine whether the trial court properly applied the best interests standard, which requires the Division to prove the following four factors by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

We discern no error.

As for the first and second prongs, which we consider together because they are interrelated, see In re Guardianship of D.M.H., 161 N.J. 365, 378-79 (1999), Matthew contends that none of his undisputed conditions – psychological disorders, substance abuse, domestic violence and violation of restraining orders, periods of incarceration, and lack of housing – presented a danger to his children's safety, health, or development. He contends that the Division did not prove Matthew caused his sons "actual harm." He notes that he acted appropriately when he visited his sons. He contends he was ready to complete services; and his conceded unavailability to assume parenting was not enough to satisfy the test.

We are unpersuaded. "Courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." Id. at 383. "Serious and lasting emotional [and] psychological harm to children as [a] result of the

16

action or <u>inaction</u> of their biological parents can constitute injury sufficient to authorize the termination of parental rights." <u>In re Guardianship of K.L.F.</u>, 129 N.J. 32, 44 (1992) (emphasis added). The absence of physical abuse or neglect is not conclusive; the court must also consider the potential for serious psychological damage. <u>N.J. Div. of Youth & Family Servs. v. A.W.</u>, 103 N.J. 591, 605 (1986); <u>N.J. Div. of Youth & Family Servs. v. A.G.</u>, 344 N.J. Super. 418, 440 (App. Div. 2001); <u>In re Guardianship of R., G. and F.</u>, 155 N.J. Super. 186, 194 (App. Div. 1977).

"A parent's withdrawal of that solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." <u>D.M.H.</u>, 161 N.J. at 379. Untreated mental illness that threatens harm to a child may disqualify a parent from raising the child. <u>F.M.</u>, 211 N.J. at 450-51. So may "[t]he lack of a permanent, safe, and stable home." <u>D.M.H.</u>, 161 N.J. at 383.

Matthew minimizes the impact of his failure, during the over-three-year period in which the children were placed with their resource parents, to complete programs and demonstrate the capability to parent. "[T]he second prong may be met by indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse, the inability to provide a stable and

17

protective home, [and] the withholding of parental attention and care." In re Guardianship of K.H.O., 161 N.J. 337, 353 (1999).

We recognize that a court may not terminate a parent's rights simply because the parent was incarcerated, see N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 556 (2014), or because the parent is impoverished, see A.W., 103 N.J. at 605. However, the trial court did nothing of the sort. The court properly considered the impact of defendant's incarceration – along with all other considerations – on his ability to complete services and to assume his parenting role. In re Adoption of Children by L.A.S., 134 N.J. 127, 143-44 (1993).

The court also gave considerable weight to Matthew's inability to parent for an extended period of time, and the consequent delay in permanency, as a result of which, "separating the child[ren] from [their] resource family parents would cause serious and enduring emotional or psychological harm to the child[ren]." N.J.S.A. 30:4C-15.1(a)(2). Matthew's professed readiness to complete recommended services, however well-intentioned, does not vitiate the court's finding regarding prongs one and two.

Turning to prong three, Matthew's contention the Division failed to make reasonable efforts to provide him services, so he could overcome the

impediments to his assuming a full-time parenting role, lack sufficient merit to warrant extended discussion.  R. 2:11-3(e)(1)(E).  "The diligence of [the Division's] efforts on behalf of a parent is not measured by their success," D.M.H., 161 N.J. at 393, particularly where the lack of success results from a parent's "failure to cooperate or follow through," N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 119 (App. Div. 2004).

Finally, Matthew has not demonstrated the court erred in finding that "[t]ermination of parental rights will not do more harm than good."  N.J.S.A. 30:4C-15.1(a)(4).  The court appropriately relied on Dr. Jeffrey's expert opinion regarding the nature of the relationship between the children and Matthew, and the children and their resource parents.  See K.H.O., 161 N.J. at 355.

The court credited Matthew's resolve to address his personal challenges. The court acknowledged Matthew's genuine affection for his children, and his refusal to surrender his rights.  Yet, the court also appropriately weighed the children's need for permanency, evidently aware "that placement plans must not lose sight of time from the perspective of the child's needs."  Id. at 357.  For the children, who spent most of their young lives with their resource parents, severing that secure relationship would cause great harm.  It was too late to wait for the uncertain date when Matthew might be prepared to assume his role as a

A-4769-18T1

parent.  In short, "time [has] run[] out for these children."  <u>Ibid.</u> (quoting <u>A.W.</u>,

103 N.J. at 615).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4769-18T1