# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5167-18T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

J.A.R.,

     Defendant-Appellant,

and

M.S. and L.F.,[1]

     Defendants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.N.R.
and M.J.R.,

     Minors.

_____

---

[1]  The trial court's judgment also terminated the rights of M.S., the biological father of Mark, and L.F., the biological father of Jake.  Neither father appealed the judgment, and they are not the subjects of the within appeal.

Submitted April 27, 2020 – Decided June 10, 2020

Before Judges Rothstadt and Mitterhoff.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FG-11-0011-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Stephania Saienni-Albert, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Sookie Bae, Assistant Attorney General, and John W. Tolleris, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

J.A.R. appeals the July 12, 2019 judgment terminating her parental rights to her sons Mark and Jake,[2] and granting the Division of Child Protection and Permanency (Division) guardianship of both children, with the plan that their maternal uncle and his fiancé adopt the children. Judge Wayne J. Forrest

---

[2] We refer to the minor children with pseudonyms, and otherwise use initials to protect the confidentiality of the participants in these proceedings. R. 1:38-3(d)(12).

presided over the ensuing four-day trial, entered judgment, and rendered a comprehensive fifty-three-page written decision. We affirm, substantially for the reasons set forth in the judge's written opinion.

The factual history of the Division's seven-year-long involvement with the family beginning in January 2012 is set forth in detail in Judge Forrest's opinion, and we need not recount it at length here. The Division's most recent involvement with J.A.R. began on February 12, 2016, after a referral from the Puerto Rican Community Day School that Mark had two consecutive unexcused absences.

Since 2016, J.A.R. has never had secure housing, moving the children between the homes of her maternal grandfather, her boyfriend, and her friends. She rejected the Division's offers of housing assistance, preferring to rely on her boyfriend J.W. to support her, even though J.W. would regularly kick J.A.R. and the children out when he was angry. Instead of obtaining stable employment, she relied on the financial support of her boyfriend or family members.

Despite admitted marijuana use, J.A.R. did not comply with the Division's referrals for substance abuse treatment. Even more concerning was her failure to take Mark to his dental appointments, a prerequisite for treatment and surgery for a cardiac condition. As a result, in June 2017, the Division obtained custody

care and supervision of both boys and placed them with their maternal uncle R.L. and his fiancé, where they remain to date. R.L. and his fiancé wish to adopt both children.

On April 12, 2019, Dr. Alan J. Lee, Psy.D., conducted a psychological evaluation of J.A.R. J.A.R. advised Dr. Lee that she was both romantically involved and currently residing with J.W. She also explained to Dr. Lee that she believed she had not been reunified with her children because she had been unable to obtain a residence, and because J.W. "used to kick her out [of his home] when he got mad."

J.A.R. expressed that she wished to be the sole caretaker for her children but acknowledged that she did not know if she would be able to handle this responsibility. She also conceded that she was unaware if or when she would ultimately secure her own residence, and she rejected the notion that she required additional treatment or services. Dr. Lee concluded that J.A.R. suffers from both cognitive and intellectual deficits. The doctor also determined that J.A.R. was both psychologically immature and less developed than most adults, which causes her to struggle with coping, adapting, judgment, and decision-making. As a result, Dr. Lee opined that J.A.R. presents as "impulsive, self-centered, self-serving, and needy," and she has trouble maintaining stability in

various aspects of her life, often relying on others to support her. Contrary to J.A.R.'s position, Dr. Lee also found that J.A.R. had "heighted level[s] of anger, resentment[,] . . . irritability[,] . . . sadness and dysphoria."

Dr. Lee diagnosed J.A.R. with Mood Disorder NOS; Impulse Control Disorder NOS; Personality Disorder NOS with Borderline, Avoidant, Antisocial, and Narcissistic traits; and Borderline Intellectual Functioning. Dr. Lee explained that J.A.R. exhibited a limited knowledge of both childcare and parenting and remains at high risk for further substance abuse. Dr. Lee thus recommended against the children's reunification with J.A.R., based on the finding that she could not independently care for the children at the time of the interview or in the foreseeable future.

That same day, Dr. Lee also conducted a bonding evaluation between J.A.R. and both children. Dr. Lee concluded that both children have "ambivalent and insecure attachment[s] and relationship[s] with [J.A.R.]" He explained that neither child shares a "significant [or] positive psychological attachment or bond" with J.A.R., and thus, if their attachment or relationship with her were permanently severed, the risk of "suffering severe and enduring psychological or emotional harm" would be low.

A-5167-18T1

Dr. Lee also conducted bonding evaluations between the children and their resource parents. He determined that the children had formed "significant and positive psychological attachment[s] and bond[s]" with their resource parents. Thus, he concluded that there would be "a significant risk of [both children] suffering severe and enduring psychological or emotional harm if [their] attachment[s] and relationships[s]" with the caretakers were to permanently end. The doctor stressed the importance of permanency to the lives of the children and cautioned that they would only be able to find permanency with the resource parents and that permanency would be unlikely with J.A.R. Dr. Lee also noted that the resource parents had both expressed a desire to adopt the children and permanently care for them.

Trial commenced before Judge Forrest on June 11, 2019. On July 12, 2019, the judge entered a judgment and accompanying opinion concluding the Division satisfied each prong under N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. Under the first prong, the judge found it was not safe to return the children, in that J.A.R. had not complied with services, had not addressed or even acknowledged her significant mental health issues, and had failed to acquire sufficient parenting skills. The judge found, with respect to the second prong, that J.A.R. had failed to obtain stable employment or housing,

had no viable plan for the children, could not provide safe and effective parenting for the children now or in the foreseeable future. Concerning prong three, the judge found the Division made reasonable efforts to provide services to J.A.R. to help her rectify the problems that led to the removal, and he detailed those efforts. With respect to prong four, the judge found termination would not do more harm than good. Dr. Lee found that J.A.R. could not safely parent the children, the children had an insecure attachment to their mother, and a delay in permanent placement for the children would harm them. Nothing in the record supported the children being seriously harmed by severing the parental ties. Termination of parental rights, in contrast, would allow them the ability for permanency. Therefore, taking into consideration the Division's plans for adoption, the judge found the Division satisfied its burden of showing that "termination of parental rights will not do more harm than good."

This appeal ensued.

J.A.R. raises the following points on appeal:

> THE TRIAL COURT'S JUDGMENT TERMINATING J.A.R.'S PARENTAL RIGHTS MUST BE REVERSED AS THE TRIAL COURT ERRED IN FINDING THAT [THE DIVISION'S] EVIDENCE SUPPORTED THE FOUR PRONGS OF N.J.S.A. 30:4C-15.1(a) BY CLEAR AND CONVINCING EVIDENCE.

I. THERE IS INSUFFICIENT EVIDENCE TO SUPPORT THE TRIAL COURT'S LEGAL CONCLUSION THAT [JAKE'S] AND [MARK'S] SAFETY, HEALTH OR DEVELOPMENT HAS BEEN OR WILL CONTINUE TO BE ENDANGERED BY THEIR PARENTAL RELATIONSHIP WITH J.A.R.

II. THE TRIAL COURT ERRED IN FINDING THAT J.A.R. WAS UNWILLING TO ELIMINATE THE HARM OR PROVIDE A SAFE AND STABLE HOME TO [JAKE] AND [MARK].

II. THE TRIAL COURT ERRED IN FINDING THAT [THE DIVISION] PROVIDED J.A.R REASONABLE EFFORTS TO REUNIFY HER WITH [JAKE] AND [MARK].

IV. [THE DIVISION] FAILED TO PROVE THAT TERMINATION OF J.A.R.'S PARENTAL RIGHTS WOULD NOT DO MORE HARM THAN GOOD TO [JAKE] AND [MARK].

N.J.S.A. 30:4C-15.1(a) authorizes the Division to petition for the termination of parental rights in the "best interests of the child" if the following standards are met:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause

serious and enduring emotional or psychological harm to the child;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

A trial court's decision to terminate parental rights is subject to limited appellate review. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007); see Cesare v. Cesare, 154 N.J. 394, 413 (1998) ("Because of the family courts' special . . . expertise in family matters, appellate courts should accord deference to family court factfinding."). The family court's decision to terminate parental rights will not be disturbed "when there is substantial credible evidence in the record to support the court's findings." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008).

J.A.R. first argues that the trial judge erred when he found clear and convincing evidence that prong one of N.J.S.A. 30:4C-15.1(a) was satisfied and that J.A.R.'s relationship with her sons endangered or would endanger their safety, health, or development. She argues that there was never any finding that

she abused or neglected her children, and she merely lacked stable finances and housing at the time her children were removed.

The first prong of the best interests analysis focuses "on the effect of harms arising from the parent-child relationship over time on the child's health and development."  In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). The harm "must be one that threatens the child's health and will likely have continuing deleterious effects on the child."  Id. at 352.

We agree with the judge's conclusion that J.A.R.'s failure to comply with the Division's services in order to remediate her significant mental health problems, her parenting deficits, and her unstable employment and housing for the five years the Division was involved with the family up until the date of trial posed an ongoing risk of harm to the children.  While there was no finding that J.A.R. physically abused her children, she was at many points during this litigation unable to care for them, and she exhibited a lack of understanding as to their particular needs, thereby endangering both their health and development. See ibid.; In re Guardianship of DMH, 161 N.J. 365, 379 (1999).

In particular, despite the Division referring J.A.R. for counseling and therapeutic services on multiple occasions to address psychological, substance abuse and parenting issues, she was inattentive and failed to comply with the

requirements of many of these programs, resulting in her early discharge from several programs. Further, J.A.R. was dismissive of the specialized needs of Mark, who has significant heart problems. She failed to take him for a required checkup with his cardiologist in 2016; did not act expeditiously to take him to a dentist appointment in 2017 that was a prerequisite for a necessary cardiac catheterization, requiring the Division's intervention; and lacked a personal cell phone, which made her unavailable during crucial moments. J.A.R. also understated the significance of Mark's heart condition when she met with psychologist Jamie Gordon-Karp for a psychological evaluation in June 2017. She claimed that his condition was no longer an issue and deflected blame for how she handled his catheterization. In this regard, her inability to care for Mark raised concerns of both present and future harm.

Moreover, J.A.R. did not address the Division's concerns regarding her unstable employment and her housing. She was never able to hold a consistent job and continuously transferred between the residences of her grandparents, her boyfriend, her friends, and her mother. According to Dr. Lee, who evaluated J.A.R. in April 2019, her lack of employment and inconsistent housing were not conducive to a stable environment for the children. We defer to the trial judge's conclusion that the children's safety, health, or development has been or will

11

continue to be harmed by J.A.R.'s continued parenting, as it was supported by ample credible evidence in the record.

J.A.R. next argues that the trial judge erred when he found clear and convincing evidence that prong two of N.J.S.A. 30:4C-15(a) was satisfied and that J.A.R. was unwilling or unable to remedy the harm that her relationship caused the children. She contends that she complied with all services ordered by the trial judge and the Division.

The second prong of the best interests test requires the Division to present clear and convincing evidence that "[t]he parent is . . . unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). The judge must consider whether the parent cured and overcame the initial harm that endangered the child and whether the parent "is able to continue a parental relationship without recurrent harm to the child." K.H.O., 161 N.J. at 348. To satisfy its burden, the Division must show the child faces continued harm because the parent is unable or unwilling to remove or overcome the harm. N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 483 (App. Div. 2012). The first and second prongs are related, and often, "evidence that supports one

informs and may support the other as part of the comprehensive basis for determining the best interests of the child." DMH, 161 N.J. at 379.

"Parental unfitness may also be demonstrated if the parent has failed to provide a 'safe and stable home for the child' and a 'delay in permanent placement' will further harm the child." K.H.O., 161 N.J. at 352 (quoting N.J.S.A. 30:4C-15.1(a)(2)). "Keeping [a] child in limbo, hoping for some long[-]term unification plan, would be a misapplication of the law." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001).

We conclude that the trial judge properly found that prong two of the best interests test was satisfied. The judge based this decision principally upon J.A.R.'s inconsistent attendance at Division-facilitated services and because she demonstrated that she gained no benefit from such services. The judge referenced her inability to secure housing or employment, and he found that to delay permanent placement would harm the children, as they had been with the resource parents for some time and permanency was only feasible with the resource parents.

The court cannot sit idly by while J.A.R. attempts to remediate her problems at some point in the future, see ibid., and to delay her children's adoption by their uncle and his fiancé would deprive them of stability, see

13

K.H.O., 161 N.J. at 352-53. The record supports the trial judge's determination that J.A.R. is both unwilling and unable to eliminate the harms facing her children and is unwilling and unable to provide them with a safe or stable home in the foreseeable future.

The third prong of the best interests test requires the Division to show that it has made reasonable efforts to reunite the family by helping the parent correct the conditions that led to the child's removal. Id. at 354. This may include, but is not limited to

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
>
> (3) informing the parent at appropriate intervals of the child's progress, development, and health; and
>
> (4) facilitating appropriate visitation.
>
> [N.J.S.A. 30:4C-15.1(c).]

"Whether particular services are necessary in order to comply with [this] requirement must . . . be decided with reference to the circumstances of the individual case before the court, including the parent's active participation in the reunification effort." DMH, 161 N.J. at 390.

Considering these principles, we concur with the trial judge that the Division provided J.A.R. with services tailored to ameliorate her parenting deficits and mental health and substance abuse issues and that those services satisfied the Division's statutory obligation. These services included parenting skills training, substance abuse evaluations, psychological evaluations, bonding evaluations, and offer of housing assistance.[3] It was J.A.R.'s minimization of her issues, her reliance on others to provide her with housing and financial support, and her failure to meaningfully and consistently engage in services that led to the Division's decision to proceed with a permanency plan for the children.

Finally, J.A.R. argues that the trial judge incorrectly found that to terminate her parental rights would not do more harm than good. She contends that in so doing, the judge incorrectly relied upon the testimony of Dr. Lee, who did not psychologically evaluate the children and likely did not know that J.A.R. had favorable visits with her children when she participated in the PEI Kids program.

---

[3] Specifically, some of the programs the Division referred J.A.R. to participate in include the following: substance abuse treatment at Family Guidance Center (FGC), additional substance abuse treatment programs after she was discharged from FGC, mental health services at Catholic Charities (from which she was discharged for noncompliance), and therapeutic and parenting services at Legacy Treatment Services. J.A.R. was also inconsistent in attending visitations and therapy and parenting classes at Mercer Street Friends and PEI Kids.

To satisfy the fourth prong, the Division need not "show[] that no harm will befall the child as a result of the severing of biological ties." K.H.O., 161 N.J. at 355. Instead, the issue "is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents." Ibid. The underlying concern of the fourth prong is the child's need for permanency within a reasonable amount of time. See In re Guardianship of J.C., 129 N.J. 1, 26 (1992).

To satisfy this prong, "[the Division] must 'offer testimony of a "well-qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation" of the child's relationship with both the natural parents and the foster parents.'" N.J. Div. of Youth & Family Servs. v. A.R., 405 N.J. Super. 418, 442 (App. Div. 2009) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007)). A comparative bonding evaluation between a child and his natural parent is generally required because the child's relationship with foster parents "must be viewed not in isolation but in a broader context that includes . . . the quality of the child's relationship with his or her natural parents." Id. at 436 (quoting J.C., 129 N.J. at 18).

In this case, the trial judge correctly concluded that the disruption of the children's relationship with their uncle and his fiancé would be more harmful to them than would the termination of J.A.R.'s parental rights. The judge referenced J.A.R.'s untreated mental health and parenting issues, as well as her inability to obtain consistent housing or employment, which rendered it unlikely and unforeseeable that she would be able to care for the children adequately at any point in the future. The judge based this determination principally upon the testimony and clinical findings of Dr. Lee, who had conducted bonding evaluations between the children and both J.A.R. and the resource parents.

Dr. Lee concluded that the children's attachment and relationships with J.A.R. were ambivalent and insecure. Dr. Lee also determined that the children did not share a significant or positive psychological attachment or bond with J.A.R. The doctor opined that if the children's attachment or relationship with J.A.R. were permanently severed, the risk of suffering severe and enduring psychological or emotional harm would be low.

In contrast, Dr. Lee concluded from his bonding evaluation between the children and the resource parents that the children had formed significant and positive psychological attachments and bonds with their uncle and his fiancé. He thus determined that if the children's relationships with the resource parents

were to permanently end, there would be a significant risk that the children would experience severe and enduring psychological or emotional harm. Dr. Lee also stressed that the resource parents were interested in adopting the children, and the children would be able to find permanency with the resource parents, while any prospect of permanency with J.A.R. was unlikely

J.A.R. presented no evidence to rebut Dr. Lee's conclusions that the children were bonded to the resource parents, that the children's attachment to J.A.R. was insecure, and that a delay in permanency would continue to harm the children. In these circumstances, the trial judge had ample support for his determination that the children's continued status without permanency with an insecure attachment to J.A.R. was more harmful than the termination of parental rights that would allow for their adoption.

To the extent we have not addressed any of J.A.R.'s remaining arguments, we find that they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION